No. 23-2139

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

TONY CUSHINGBERRY,
Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Indiana
Case No. 1:20-CR-00112
The Honorable Judge Jane E. Magnus-Stinson

**Brief in support of motion to withdraw as Defendant-Appellant's appointed appellate counsel pursuant to *Anders v. California*, 386 U.S. 738 (1967), and short appendix**

FEDERAL PUBLIC DEFENDER
CENTRAL DISTRICT OF ILLINOIS
300 W. Main St.
Urbana, IL 61801
Telephone:   (217) 373-0666
Fax:         (217) 373-0667
Email:  Michael_Roy@fd.org

THOMAS W. PATTON
Federal Public Defender

MICHAEL WILL ROY
Assistant Federal Public Defender

Attorneys for Defendant-Appellant,
TONY CUSHINGBERRY

## Circuit Rule 26.1 Disclosure Statement

Appellate Court No: 23-2139
Short Caption: United States v. Cushingberry

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case:

**Tony Cushingberry**

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

**Federal Public Defender's Office for the Central District of Illinois; and Indiana Federal Community Defenders**

(3)     If the party or amicus is a corporation: N/A
     i)     Identify all its parent corporations, if any; and

          **N/A**

     i)     list any publicly held company that owns 10% or more of the party's or amicus' stock:

          **N/A**

(4)     Provide the information required by FRAP 26.1(b) - Organizational Victims in Criminal Cases:

**N/A**

(5)     Provide Debtor information required by FRAP 26.1(c)1 & 2:

**N/A**

Attorney's Signature: **/s/ Michael Will Roy**                    Date: **January 2, 2024**
Attorney's Printed Name:  Michael Will Roy

Please indicate if you are *Counsel of Record* for the          ☒  **Yes**
above listed parties under Circuit Rule 3(d).                    ☐  No

Address:  Federal Public Defender          Phone Number:  (217) 373-0666
          300 West Main Street               Fax Number:    (217) 373-0667
          Urbana, Illinois 61801             Email:         Michael_Roy@fd.org

## Table of Contents

**Page**

Circuit Rule 26.1 Disclosure Statement .................................................................. ii

Table of Authorities .......................................................................................... v

Preface ............................................................................................................... 1

Jurisdictional Statement ...................................................................................... 2

Issues Presented for Review ................................................................................ 3

     I.    Whether any challenge to Tony Cushingberry's conviction would be frivolous when he pleaded guilty pursuant to a plea agreement, did not seek to withdraw his plea in the district court, and does not wish to do so on appeal? .................................................................. 3

     II.   Whether any argument challenging Tony Cushingberry's sentence would be frivolous, given that Cushingberry explicitly waived his right to appeal his sentence in the plea agreement? ............................... 3

Statement of the Case .......................................................................................... 4

     I.    Indictment and plea agreement ............................................................. 4

     II.   Sentencing ........................................................................................... 7

Summary of Argument ...................................................................................... 10

Argument ........................................................................................................ 11

     I.    Any argument challenging Tony Cushingberry's conviction would be frivolous because he entered a knowing and voluntary plea of guilty, did not seek to withdraw his plea in the district court, and does not wish to withdraw it now .................................................................. 11

          A.    Standard of review ..................................................................... 11

          B.    Relevant legal principles ............................................................ 11

     II.   Any argument challenging Cushingberry's sentence would be frivolous because he waived his right to appeal. ................................... 12

          A.    Standard of review ..................................................................... 12

B.    Relevant legal principles ............................................................ 12

C.    The appeal waiver is valid and enforceable. ...............................13

D.    In light of the valid appeal waiver, Cushingberry cannot raise a
nonfrivolous challenge to his sentence. .................................... 14

Conclusion.................................................................................................. 18

Certificate of Compliance with Fed. R. App. P. 32(a)(7)(B) ............................ 19

# Table of Authorities

**Page**

## Cases

*Anders v. California*, 386 U.S. 738 (1967) ........................................................ 1, 11

*Booth v. Maryland*, 482 U.S. 496 (1987) ...................................................... 15, 16

*Bosse v. Oklahoma*, 580 U.S. 1 (2016) ...............................................................15

*Commonwealth v. McGonagle*, 88 N.E.3d 1128 (Mass. 2018) ........................... 16

*Jones v. United States*, 167 F.3d 1142 (7th Cir. 1998) ...............................13, 14, 17

*United States v. Booker*, 543 U.S. 220 (2005) .................................................. 12

*United States v. Campbell*, 813 F.3d 1016 (7th Cir. 2016) .......................15, 16, 17

*United States v. Combs*, 657 F.3d 565 (7th Cir. 2011) .......................................11

*United States v. Galloway*, 917 F.3d 604 (7th Cir. 2019) ................................... 12

*United States v. Harris*, 51 F.4th 705 (7th Cir. 2022) ....................................... 12

*United States v. Hopper*, 11 F.4th 561 (7th Cir. 2021)....................................... 16

*United States v. Horsfall*, 552 F.3d 1275 (11th Cir. 2008) ................................. 16

*United States v. Knox*, 287 F.3d 667 (7th Cir. 2002)..................................... 11, 13

*United States v. Nulf*, 978 F.3d 504 (7th Cir. 2020)........................................... 14

*United States v. Salutric*, 775 F.3d 948 (7th Cir. 2015) ..................................... 16

*United States v. Santana*, 908 F.2d 506 (9th Cir. 1990)..................................... 16

*United States v. Stokes*, 726 F.3d 880 (7th Cir. 2013)........................................17

*United States v. Villarreal-Tamayo*, 467 F.3d 630 (7th Cir. 2006).....................11

*United States v. Vonn*, 535 U.S. 55 (2002) .......................................................11

*United States v. Wenger*, 58 F.3d 280 (7th Cir. 1995)........................................ 12

*United States v. Worden*, 646 F.3d 499 (7th Cir. 2011) .................................................. 12

## Statutes

18 U.S.C. § 924(c) ....................................................................................... 2, 4

18 U.S.C. § 1111 .......................................................................................2, 4, 14

18 U.S.C. § 1114 ........................................................................................ 2, 4

18 U.S.C. § 2255 ..........................................................................................17

18 U.S.C. § 3013(a) ...................................................................................... 14

18 U.S.C. § 3231 ........................................................................................... 2

18 U.S.C. § 3571(b) ...................................................................................... 14

18 U.S.C. § 3582 ........................................................................................... 5

18 U.S.C. § 3742 ..................................................................................... 2, 12, 13

28 U.S.C. § 1291 ........................................................................................... 2

## Other Authorities

U.S.S.G. § 3A1.2 ......................................................................................... 4

U.S.S.G. § 3E1.1 ........................................................................................... 5

## Preface

After carefully examining the record on appeal and researching the relevant law, I have concluded that the appeal presents no legally nonfrivolous question. In reaching this conclusion, I have thoroughly scrutinized the record, including the indictments, the plea agreement, a transcript of the Rule 11 proceeding, the presentencing report, the sentencing exhibits, and a transcript of the sentencing hearing, for any arguable violation of the United States Constitution, the applicable federal statutes, the Federal Rules of Criminal Procedure, or the United States Sentencing Guidelines. Because I have concluded that no nonfrivolous issue is presented by this appeal, I request leave to withdraw as counsel and submit this brief in accordance with *Anders v. California*, 386 U.S. 738 (1967).

# Jurisdictional Statement[1]

The jurisdiction of the United States District Court for the Southern District of Indiana was founded upon 18 U.S.C. § 3231. A grand jury sitting in the aforementioned district charged Tony Cushingberry by indictment with second-degree murder of a United States employee, in violation of 18 U.S.C. §§ 1111 and 1114, and discharging a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). (R. 18, 58.) Cushingberry pleaded guilty to the former charge. (R. 71, 74.)

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The district court imposed sentence on May 31, 2023 (R. 109), and it entered a final judgment in a criminal case on June 1, 2023. (R. 110.) Cushingberry filed a timely notice of appeal on June 7, 2023. (R. 112.)

---

[1] The following abbreviations are used herein: Record on appeal: "R.___ at ___;" Appendix: "App. at ___;" Change of Plea hearing transcript: "Plea Tr. at ___;" and Presentence Investigation Report: "PSR ¶ ___."

**Issues Presented for Review**

I. Whether any challenge to Tony Cushingberry's conviction would be frivolous when he pleaded guilty pursuant to a plea agreement, did not seek to withdraw his plea in the district court, and does not wish to do so on appeal?

II. Whether any argument challenging Tony Cushingberry's sentence would be frivolous, given that Cushingberry explicitly waived his right to appeal his sentence in the plea agreement?

**Statement of the Case**

### I.     Indictment and plea agreement

A grand jury indicted Tony Cushingberry of second-degree murder of a United States employee, in violation of 18 U.S.C. §§ 1111 and 1114, and discharge of a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). (R. 18.) The indictment alleged that Cushingberry shot and killed a postal worker while she was engaged in her official duties. (R. 18 at 1.) The government later submitted a superseding indictment with substantively the same charges, but minor tweaks related to forfeiture of the firearm and other small wording changes. (R. 58.)

The parties entered a plea agreement, in which Cushingberry would plead guilty to the murder charge. (R. 71.) In exchange, the government agreed to dismiss the other gun charge under § 924(c). (R. 71 ¶ 2.)

As a factual basis, Cushingberry would agree that he "aggressively" followed the postal worker during a disagreement about undelivered mail. (R. 71 ¶ 23.b.) The postal worker then sprayed Cushingberry with defensive spray. (R. 71 ¶ 23.b.) In response, Cushingberry pulled a handgun from his waist and shot at the postal worker one time from several feet away. (R. 71 ¶ 23.b.) The postal worker later died from her injuries. (R. 71 ¶ 23.c.)

As part of the plea agreement, Cushingberry would also concede that the offense was motivated by the postal worker's status as a government employee, warranting a six-level guideline enhancement under U.S.S.G. § 3A1.2(a)–(b). (R. 71 ¶ 27.b.) The

government, on the other hand, agreed that Cushingberry would receive a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. (R. 71 ¶ 27.c) The parties agreed this would result in an expected final offense level of 41. (R. 71 ¶ 27.d.)

Finally, the plea agreement included a broad appeal waiver. (R. 71 ¶ 28–30.) Cushingberry waived his right to challenge on direct appeal "the conviction and sentence imposed in this case on any ground." (R. 71 ¶ 28.) The waiver explicitly covered any challenges to the constitutionality of the statute of conviction or arguments that Cushingberry's conduct did not fall within the statute. (R. 71 ¶ 28.) It further covered any challenge to the final sentence or "the manner in which the sentence was determined," including the length and conditions of supervised release. (R. 71 ¶ 28.) The waiver included limited carveouts to allow Cushingberry to raise claims for ineffective assistance of counsel or file motions to reduce the sentence under 18 U.S.C. § 3582, if such motions would be appropriate in the future. (R. 71 ¶ 29.)

At the change of plea hearing, the district court conducted a Rule 11 colloquy with Cushingberry to make sure that his plea was knowing and voluntary. (R. 125, Plea Tr.) After warning Cushingberry that he was under oath and his answers could be used in future prosecutions (Plea Tr. at 2), the court confirmed that Cushingberry had graduated high school and could read and understand the plea agreement (Plea Tr. at 3). Cushingberry stated that he was sober and had no history of mental-health or substance-abuse treatment (Plea Tr. at 3–4), had fully discussed the charges with his lawyer (Plea Tr. at 4), and was pleading guilty of his own free will and because of any promises or

assurances outside the written agreement (Plea Tr. at 5). The court explained that the charge to which Cushingberry was pleading guilty carried a maximum penalty of life in prison, five years' supervision, a fine of up to $250,000, a $100 special assessment, and restitution. (Plea Tr. at 6, 12.) He could also suffer collateral consequences, the court warned, such as the loss of his right to vote or hold public office. (Plea Tr. at 21.)

The court also reviewed the elements of second-degree murder of a government employee and explained that, had Cushingberry gone to trial, the government would have needed to prove those elements beyond a reasonable doubt. (Plea Tr. at 6.) By pleading guilty, the court explained, Cushingberry waived his rights to maintain his not guilty plea, proceed to a public and speedy trial by jury, have counsel throughout trial, see the government's witnesses and cross-examine them, testify or not testify in his own defense, and subpoena other witnesses. (Plea Tr. at 7, 9–11.) The court further explained that it would consider the guidelines range when sentencing Cushingberry but ultimately would have discretion to sentence him outside that range after hearing each side's evidence and arguments. (Plea Tr. at 7–8, 11–12.) And it warned that Cushingberry could not withdraw his plea if his sentence is higher than expected. (Plea Tr. at 8.) The court also explained that Cushingberry would agree to forfeit his pistol and ammunition. (Plea Tr. at 13–14.) After reviewing the factual basis in the plea agreement, the court concluded that the factual basis supported the plea. (Plea Tr. at 14–15.)

Finally, before accepting the plea, the court separately addressed the appeal waiver. (Plea Tr. at 16.) Cushingberry confirmed that he understood that he would waive

his right to appeal his conviction and sentence "on any ground." (Plea Tr. at 16.) The court clarified the waiver's carveouts for ineffective-assistance claims and future motions for reduction of sentence, while also highlighting specific issues that Cushingberry would not be able to raise like challenges to his supervised release or arguments that his conduct fell outside the criminal statute. (Plea Tr. at 16–19.) Cushingberry confirmed that he talked with his lawyer about the appeal waiver and agreed to it of his own free will. (Plea Tr. at 20.)

The court found Cushingberry competent and capable of entering an informed, knowing, and voluntary plea. (Plea Tr. at 21–22.) It accepted the plea and found him guilty. (Plea Tr. at 22.)

## II.    Sentencing

Based on a final offense level of 41 and criminal-history score of zero, a probation officer calculated an advisory guidelines range of 324 to 405 months' imprisonment. (PSR ¶ 58.) The parties agreed that this calculation was correct. (App. at 14.)

The defense requested a below-guidelines sentence of no more than 18 years. (R. 98; App. at 44.) The defense surveyed other second-degree murder cases, and pointed out that most similarly situated defendants received below-guidelines sentences despite even with aggravating factors. (R. 98 at 8–12.) Cushingberry's case, on the other hand, included lots of mitigation. The defense submitted a 112-page mitigation packet, detailing Cushingberry's unstable childhood and his need to take on parental responsibility at a young age to make up for an unreliable and alcoholic mother. (R. 95.) Despite a rough

upbringing, Cushingberry was a good student who stayed out of trouble and consistently exerted a positive influence on those around him. (*E.g.,* R. 95-2 at 5, 14–15; App. at 28–37.) He had no criminal background, no involvement in criminal activities, and no enemies. (R. 95-2 at 16.) He legally possessed the gun used in the offense only because his mother and her ex-partner had pressured him into obtaining a firearm-carry permit. (R. 95-2 at 17.)

A fight between Cushingberry's mother and the postal worker led to the incident in this case. Tensions were running high between the two women because of longstanding fights over the Cushingberry family's pet chihuahua, which the postal worker saw as a threat. (R. 98 at 2.) Eventually, the mail carrier refused to deliver mail to the house and bragged on Facebook how the family would not get their pandemic-stimulus checks. (R. 98 at 2.)

On the day of the incident, Cushingberry had spent the morning trying to help fix his mother's car. (R. 98 at 4.) When he arrived home, he found his intoxicated mother arguing with the postal worker about the mail. (R. 98 at 4.) Cushingberry approached the postal worker to try to sort out the problem—as he often needed to do for problems his mother caused. (R. 98 at 5.) When the postal worker reacted by spraying Cushingberry with defensive spray, he reacted and reflexively fired one round from his pistol. (R. 98 at 5.)

In contrast to the defense, the government sought an above-guidelines sentence of 40 years' imprisonment. (R. 102 at 10.) It cited the seriousness of the crime and negative

impact on the victim's family. (R. 102 at 11–13; App. at 15–20.) Regarding deterrence, the government conceded that Cushingberry posed little need for specific deterrence. (R. 102 at 13.) But it argued that a long sentence was necessary for general deterrence to send a message to the public. (R. 102 at 13.) To hammer this point home, the government submitted roughly two hundred letters from postal workers in Indiana. (R. 88.) Most of these letters were prewritten forms, asking the judge to impose the maximum sentence allowed by law.

The court imposed a sentence of 30 years' imprisonment. (App. at 67.) The court explained that murder is the most serious crime. (App. at 59.) And although it found Cushingberry's mitigation evidence significant, the court said it also had to consider the impact on the victims. (App. at 60–61.) The need for general deterrence, the court continued, could be seen in the statements from the postal community. (App. at 63.) A sentence of 30 years, which the court estimated would have been the victim's remaining life expectancy, was thus appropriate. (App. at 66.)

## Summary of Argument

No nonfrivolous issue can be raised regarding Tony Cushingberry's adjudication of guilt. Cushingberry entered a knowing and voluntary guilty plea, pursuant to a written plea agreement with the government. Cushingberry did not seek to withdraw his plea in the district court, nor does he wish to do so on appeal. Accordingly, no nonfrivolous issue can be raised with respect to Cushingberry's guilty plea or conviction.

Furthermore, no nonfrivolous issue can be raised regarding Cushingberry's sentence. Cushingberry waived his right to appeal his sentence in his plea agreement. No element of Cushingberry's sentence exceeded a statutory maximum or otherwise implicates an exception to the appeal waiver. Therefore, there is no nonfrivolous sentencing issue to raise on appeal.

## Argument

**I.    Any argument challenging Tony Cushingberry's conviction would be frivolous because he entered a knowing and voluntary plea of guilty, did not seek to withdraw his plea in the district court, and does not wish to withdraw it now.**

### A.    Standard of review

Because Cushingberry did not move to withdraw his guilty plea in the district court, any challenge to his plea would be reviewed for plain error. *United States v. Vonn*, 535 U.S. 55 (2002); *United States v. Villarreal-Tamayo*, 467 F.3d 630, 632 (7th Cir. 2006).

### B.    Relevant legal principles

An unconditional guilty plea "waives all nonjurisdictional defects arising before [the] plea." *United States v. Combs*, 657 F.3d 565, 568 (7th Cir. 2011). Cushingberry entered an unconditional plea in this case, so the only potential issue would be whether his plea was knowing and voluntary.

In *United States v. Knox*, 287 F.3d 667 (7th Cir. 2002), however, this Court explained that appellate counsel making an *Anders* submission need not—and, indeed, should not—explore the validity of a plea, "unless they know after consulting their clients, and providing advice about the risks, that the defendant really wants to withdraw the guilty plea." *Id.* at 671. Following this Court's direction, I have advised Cushingberry about the risks and benefits of challenging his plea and determined that Cushingberry does not wish to withdraw his guilty plea. Accordingly, I offer no further consideration regarding whether Cushingberry's plea could be challenged on appeal.

**II.     Any argument challenging Cushingberry's sentence would be frivolous because he waived his right to appeal.**

**A.     Standard of review**

This Court reviews *de novo* the enforceability of an appeal waiver. *United States v. Harris*, 51 F.4th 705, 720 (7th Cir. 2022).

**B.     Relevant legal principles**

Usually, a defendant may appeal a sentence if it was imposed in violation of law, was imposed as a result of an incorrect application of the Sentencing Guidelines, or was otherwise unreasonable. 18 U.S.C. § 3742; *United States v. Booker*, 543 U.S. 220, 260-63 (2005). But a defendant may waive these appeal rights as part of a plea agreement. *See United States v. Galloway*, 917 F.3d 604, 606 (7th Cir. 2019). The validity of such an appeal waiver rests on whether it is "clear and unambiguous" and whether the record clearly demonstrates that the defendant "knowingly and voluntarily" waived appeal rights. *United States v. Worden*, 646 F.3d 499 (7th Cir. 2011). When determining whether a written appeal waiver is knowing and voluntary, the waiver of appeal "must stand or fall with the agreement[ ] of which [it is] a part. If the agreement is voluntary, and taken in compliance with Rule 11, then the waiver of appeal must be honored." *United States v. Wenger*, 58 F.3d 280, 282 (7th Cir. 1995). A written appeal waiver signed by the defendant is typically considered voluntary and knowing. *Galloway*, 917 F.3d at 606.

Accordingly, this Court will usually honor an explicit appeal waiver that is part of a plea agreement unless the sentence is in excess of a statutory maximum sentence or based

on a constitutionally impermissible factor like race. *Jones v. United States*, 167 F.3d 1142, 1144 (7th Cir. 1998).

### C.    The appeal waiver is valid and enforceable.

In accordance with *Knox*, Cushingberry's choice not to withdraw his guilty plea compels the conclusion that counsel should not further scrutinize or address whether Cushingberry's plea was knowing and voluntary. 287 F.3d at 671-72. And within the plea agreement, the waiver of appellate rights was clear and unambiguous. Here is the section of plea agreement in which Cushingberry waived his right to direct appeal:

> **Direct Appeal**: The defendant understands that the defendant has a statutory right to appeal the conviction and sentence imposed and the manner in which the sentence was determined. Acknowledging this right, and in exchange for the concessions made by the Government in this Plea Agreement, the defendant expressly waives the defendant's right to appeal the conviction and sentence imposed in this case on any ground, including the right to appeal conferred by 18 U.S.C. § 3742. The defendant further expressly waives any and all challenges to the statute to which the defendant is pleading guilty on constitutional grounds, as well as any challenge that the defendant's admitted conduct does not fall within the scope of the applicable statute. This waiver of appeal specifically includes all provisions of the guilty plea and sentence imposed, including the length and conditions of supervised release and the amount of any fine.

(R. 71 ¶ 28.)

During the change of plea hearing, the district court carefully determined that Cushingberry understood this provision. (Plea Tr. at 16–20.) No argument could be raised challenging the provision's enforceability, especially since Cushingberry does not wish to withdraw his plea.

**D.    In light of the valid appeal waiver, Cushingberry cannot raise a nonfrivolous challenge to his sentence.**

Because Cushingberry knowingly agreed to the appeal waiver, this Court will enforce the waiver except in "extraordinary circumstances," *United States v. Nulf*, 978 F.3d 504, 505 (7th Cir. 2020), such as when the sentence is above a statutory maximum or the result of the district court's reliance on a constitutionally impermissible factor like race. *Jones*, 167 F.3d at 1144.

Here, the sentence was well within statutory limits. The district court adopted the PSR and its guidelines calculation of 324 to 405 months' imprisonment. (PSR ¶ 58; App. at 13–14.) It then imposed a within-guidelines sentence of 360 months' imprisonment. (App. at 67.) Both the guidelines range and the ultimate sentence were below the statutory maximum of life. *See* 18 U.S.C. § 1111(b). The district court also imposed a $100.00 special assessment, as mandated by 18 U.S.C. § 3013(a)(2)(A). (App. at 68.) And it imposed a fine of $1,000 (App. at 67), which was below the statutory maximum of $250,000. *See* 18 U.S.C. § 3571(b). No element of Cushingberry's sentence exceeds any statutory maximum.

I considered whether a challenge could nonetheless be made regarding the government's use of inappropriate victim impact statements. The government filed hundreds of statements from postal workers in Indiana, the vast majority of whom did not know the decedent and could not be considered "victims" under any definition of the word. (R. 88.) Most of these statements were form letters printed and distributed for

14

postal workers to sign. (*See, e.g.,* R. 88-6.) Because the government collected and filed these letters on behalf of the signatories, it is not clear whether the prosecution actively solicited these letters from nonvictims.

The content of the form letters is potentially problematic under Supreme Court precedent. In the capital sentencing context, the Supreme Court has held that victims are prohibited from opining about the crime, the defendant, or the appropriate punishment. *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016); *Booth v. Maryland*, 482 U.S. 496 (1987). The government's form letter in this case explicitly asked the court to impose a maximum sentence, contrary to the restrictions suggested by *Booth*. (R. 88-6.) And the government did not merely submit one or two letters with this request—it flooded the court with *hundreds* of letters asking the court to be as harsh as possible. The district court then cited these letters as an influence on its sentence. (App. at 63.)

Although the appeal waiver generally bars challenges to how the sentence was determined, I considered whether this flood of nonvictim letters could be an "exceptional circumstance" that would overcome the waiver. This Court has noted that, appeal waivers notwithstanding, this Court will sometimes still review "unorthodox" sentencing practices or issues that implicate the "fundamental legitimacy of the judicial process." *United States v. Campbell*, 813 F.3d 1016, 1019 (7th Cir. 2016) (collecting cases). I considered whether the postal-worker letters could fall into this category.

Ultimately, however, I concluded that no issue could be raised on this front. Cushingberry did not object to the letters in the district court, so this Court would review

them—if at all—only for plain error. *See United States v. Salutric*, 775 F.3d 948, 951 (7th Cir. 2015). Thus far, when the Supreme Court has set limits on victim impact statements, it has done so only in the capital-sentencing context. *See Booth*, 482 U.S. at 509 n.12 ("We imply no opinion as to the use of these statements in noncapital cases."). Attempts by other defendants to expand those limitations to noncapital cases like this one have failed. *See United States v. Santana*, 908 F.2d 506, 507 (9th Cir. 1990) (*Booth* applies only to capital sentencing); *Commonwealth v. McGonagle*, 88 N.E.3d 1128, 1131 (Mass. 2018) (same). *See also Salutric*, 775 F.3d at 951 (no plain error to consider statements from nonvictims). Without any binding precedent supporting Cushingberry's position, and with at least some nonbinding authority cutting against it, Cushingberry cannot overcome plain-error review. *See United States v. Hopper*, 11 F.4th 561, 572 (7th Cir. 2021) (circuit split weighs against plain error); *United States v. Horsfall*, 552 F.3d 1275, 1284 (11th Cir. 2008) (*Booth* claim in noncapital case cannot succeed under plain-error review). And if the court's reliance on the postal-worker letters was not plainly erroneous, I do not see how it can be so "unorthodox" or against the "fundamental legitimacy of the judicial process" as to overcome the appeal waiver. *Campbell*, 813 F.3d at 1019.

Finally, I considered whether Cushingberry could raise any claim for ineffective assistance of trial counsel. Ineffective assistance is an exception to the appeal waiver. (R. 71 ¶ 29.) And I discussed the possibility of such a claim with Cushingberry, based on his belief that counsel's pre-plea and pre-sentencing investigations fell short. But any ineffective-assistance claim would be doomed on direct appeal because the record lacks

any evidence about counsel's performance. An ineffective-assistance claim would be best brought in a motion under 18 U.S.C. § 2255, in which Cushingberry might develop a factual record. *See United States v. Stokes*, 726 F.3d 880, 898 (7th Cir. 2013).

Thus, I concluded that this Court would honor Cushingberry's appeal waiver against any challenge to his sentence. His sentence is not in excess of a statutory maximum, the result of a constitutionally impermissible factor, or a claim that implicates the fundamental legitimacy of the sentencing process. *Jones*, 167 F.3d at 1144; *Campbell*, 813 F.3d at 1019. Cushingberry's waiver of his right to appeal renders any arguments challenging his sentence frivolous.

**Conclusion**

For the reasons stated herein, undersigned counsel respectfully asks this Court to allow Cushingberry's counsel to withdraw.

<div style="margin-left:40%">

Respectfully submitted,
Thomas W. Patton
Federal Public Defender

s/  Michael Will Roy
Michael Will Roy
Assistant Federal Public Defender

Attorneys for Defendant-Appellant,
TONY CUSHINGBERRY

</div>

**Certificate of Compliance with Fed. R. App. P. 32(a)(7)(B)**

The undersigned certifies that this brief complies with the volume limitations of

Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32 in that it contains

3,776 words as shown by Microsoft Word for Microsoft 365 used in preparing this brief.

<u>s/ Michael Will Roy</u>
Michael Will Roy
Assistant Federal Public Defender

Dated:  January 2, 2024

No. 23-2139

_____

United States Court of Appeals
for the Seventh Circuit

_____

United States of America,
Plaintiff-Appellee,

vs.

Tony Cushingberry,
Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Indiana
Case No. 1:20-CR-00112
The Honorable Judge Jane E. Magnus-Stinson

_____

Required short appendix of
Defendant-Appellant, Tony Cushingberry

_____

Federal Public Defender               Thomas W. Patton
Central District of Illinois          Federal Public Defender
300 W. Main St.
Urbana, IL 61801                      Michael Will Roy
Telephone:   (217) 373-0666           Assistant Federal Public Defender
Fax:         (217) 373-0667
Email: colleen_ramais@fd.org          Attorneys for Defendant-Appellant,
                                      Tony Cushingberry

**Certificate of Compliance with Circuit Rule 30**

The undersigned counsel for Defendant-Appellant, hereby states that all of the materials required by Circuit Rule 30(a) and 30(b) are included in the Appendix to this brief.

<div align="right">

s/ Michael Will Roy
Michael Will Roy
Assistant Federal Public Defender

</div>

Date: January 2, 2024

## Appendix Table of Contents

**Page**

Certification.................................................................................................. ii

Judgment in a Criminal Case ........................................................................A1

Sentencing Hearing transcript, May 31, 2023 .................................................. A8

AO 245B (Rev. 09/19) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Southern District of Indiana

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br><br>TONY CUSHINGBERRY<br>A/K/A TONY CUSHINGBERRY-MAYS | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number: 1:20CR00112-001<br>USM Number: 17557-028<br><br><br>Sara Varner, Dominic Martin, and Joseph Cleary<br>Defendant's Attorney |

**THE DEFENDANT:**

☒ pleaded guilty to Count 1s

☐ pleaded nolo contendere to count(s) which was accepted by the court.

☐ was found guilty on count(s) after a plea of not guilty

The defendant is adjudicated guilty of these offense(s):

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18§§ 1111 and 1114 | Murder in the Second Degree and Protection of an Employee of the United States | 04/27/2020 | 1 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☒ Count 2s was dismissed on the oral motion of the United States.

**IT IS ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

May 31, 2023
Date of Imposition of Sentence:


Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**A CERTIFIED TRUE COPY**
Roger A.G. Sharpe, Clerk
U.S. District Court
Southern District of Indiana
BY
Deputy Clerk

Date: 6/1/2023

A1

AO245B(Rev 02/16) Judgment in a Criminal Case                                                    Judgment Page 2 of 7

DEFENDANT: Tony Cushingberry, a/k/a Tony Cushingberry-Mays
CASE NUMBER: 1:20CR00112-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **360 months.**

☒The Court makes the following recommendations to the Bureau of Prisons: **Placement at Greenville, Illinois, or another medium security BOP facility. Participation in the following programs: substance abuse treatment, to include RDAP; mental health and trauma treatment; educational programming; vocational programming related to electrical and/or truck driving; the BRAVE program; and cognitive programming.**

☒The defendant is remanded to the custody of the United States Marshal.

☐The defendant shall surrender to the United States Marshal for this district:

    ☐ at

    ☐ as notified by the United States Marshal.

☐The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

    Defendant was delivered on _____ to _____

at _____, with a certified copy of this judgment.

                              _____

                                    UNITED STATES MARSHAL

                     BY: _____

                                   DEPUTY UNITED STATES MARSHAL

AO245B(Rev 02/16) Judgment in a Criminal Case                                    Judgment Page 3 of 7

DEFENDANT: Tony Cushingberry, a/k/a Tony Cushingberry-Mays
CASE NUMBER: 1:20CR00112-001

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **3 years.**

## MANDATORY CONDITIONS

1. You shall not commit another federal, state, or local crime.
2. You shall not unlawfully possess a controlled substance.
3. You shall refrain from any unlawful use of a controlled substance.  You shall submit to one drug test within 15 days of release from imprisonment and at least two periodic least two periodic drug tests thereafter, as determined by the court.
   - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse.  *(check if applicable)*
4. ☐ You shall make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution.  *(check if applicable)*
5. ☒ You shall cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You shall comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location      where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You shall participate in an approved program for domestic violence. *(check if applicable)*

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant shall comply with the conditions listed below.

## CONDITIONS OF SUPERVISION

a)   You shall report to the probation office in the federal judicial district to which you are released within 72 hours of release from the custody of the Bureau of Prisons.

b)   You shall report to the probation officer in a manner and frequency directed by the court or probation officer.

c)   You shall permit a probation officer to visit you at a reasonable time at home, or another place where the officer may legitimately enter by right or consent and shall permit confiscation of any contraband observed in plain view of the probation officer.

d)   You shall not knowingly leave the federal judicial district where you are being supervised without the permission of the supervising court/probation officer.

e)   You shall answer truthfully the inquiries by the probation officer, subject to your 5th Amendment privilege.

f)   You shall not meet, communicate, or otherwise interact with a person you know to be engaged, or planning to be engaged, in criminal activity.  You shall report any contact with persons you know to be convicted felons to your probation officer within 72 hours of the contact.

g)   You shall reside at a location approved by the probation officer and shall notify the probation officer at least 72 hours prior to any planned change in place or circumstances of residence or employment (including, but not limited to, changes in who lives there, job positions, job responsibilities).  When prior notification is not possible, you shall notify the probation officer within 72 hours of the change.

h)   You shall not own, possess, or have access to a firearm, ammunition, destructive device or dangerous weapon.

A3

Case 1:20-cr-00112-JMS-KMB   Document 110   Filed 06/01/23   Page 4 of 7 PageID #: 835
Case: 23-2139        Document: 16        Filed: 01/02/2024        Pages: 98
AO245B(Rev 02/16) Judgment in a Criminal Case                                    Judgment Page 4 of 7

DEFENDANT: Tony Cushingberry, a/k/a Tony Cushingberry-Mays
CASE NUMBER: 1:20CR00112-001

i)      You shall notify the probation officer within 72 hours of being arrested, charged, or questioned by a law enforcement officer.

j)      You shall maintain lawful full-time employment, unless excused by the probation officer for schooling, vocational training, or other reasons that prevent lawful employment.

k)      You shall make a good faith effort to follow instructions of the probation officer necessary to ensure compliance with the conditions of supervision.

l)      You shall participate in a substance abuse or alcohol treatment program approved by the probation officer and abide by the rules and regulations of that program. The probation officer shall supervise your participation in the program (provider, location, modality, duration, intensity, etc.).  The court authorizes the release of the presentence report and available evaluations to the treatment provider, as approved by the probation officer.

m)      You shall not use or possess any controlled substances prohibited by applicable state or federal law, unless authorized to do so by a valid prescription from a licensed medical practitioner. You shall follow the prescription instructions regarding frequency and dosage.

n)      You shall submit to substance abuse testing to determine if you have used a prohibited substance or to determine compliance with substance abuse treatment. Testing may include no more than 8 drug tests per month.  You shall not attempt to obstruct or tamper with the testing methods.

o)      You shall not knowingly purchase, possess, distribute, administer, or otherwise use any psychoactive substances (e.g., synthetic marijuana, bath salts, Spice, glue, etc.) that impair a person's physical or mental functioning, whether or not intended for human consumption.

p)      You shall provide the probation officer access to any requested financial information and shall authorize the release of that information to the U.S. Attorney's Office for use in connection with the collection of any outstanding fines and/or restitution.

q)      You shall submit to the search by the probation officer of your person, vehicle, office/business, residence, and property, including any computer systems and hardware or software systems, electronic devices, telephones, and Internet-enabled devices, including the data contained in any such items, whenever the probation officer has a reasonable suspicion that a violation of a condition of supervision or other unlawful conduct may have occurred or be underway involving you and that the area(s) to be searched may contain evidence of such violation or conduct.  Other law enforcement may assist as necessary.  You shall submit to the seizure of contraband found by the probation officer. You shall warn other occupants these locations may be subject to searches.

I understand that I and/or the probation officer may petition the Court to modify these conditions, and the final decision to modify these terms lies with the Court.  If I believe these conditions are being enforced unreasonably, I may petition the Court for relief or clarification; however, I shall comply with the directions of my probation officer unless or until the Court directs otherwise.  Upon a finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the condition of supervision.

Case 1:20-cr-00112-JMS-KMB   Document 110   Filed 06/01/23   Page 5 of 7 PageID #: 836
Case: 23-2139      Document: 16      Filed: 01/02/2024      Pages: 98
AO245B(Rev 02/16) Judgment in a Criminal Case                                          Judgment Page 5 of 7

DEFENDANT: Tony Cushingberry, a/k/a Tony Cushingberry-Mays
CASE NUMBER: 1:20CR00112-001

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed)

_____          _____
Defendant                                                              Date

_____          _____
U.S. Probation Officer/Designated Witness                    Date

AO245B(Rev 02/16) Judgment in a Criminal Case                                          Judgment Page 6 of 7

DEFENDANT: Tony Cushingberry, a/k/a Tony Cushingberry-Mays
CASE NUMBER: 1:20CR00112-001

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties in accordance with the schedule of payments set forth in this judgment.

|  | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment\*** | **JVTA Assessment\*\*** |
|---|---|---|---|---|---|
| **TOTALS** | $100.00 | | $1,000.00 | | |

☐ The determination of restitution is deferred until.  An *Amended Judgment in a Criminal Case (AO245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| **Totals** |  |  |  |

☐ Restitution amount ordered pursuant to plea agreement $

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☒ the interest requirement is waived for the ☒ fine ☐ restitution

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Case 1:20-cr-00112-JMS-KMB   Document 110   Filed 06/01/23   Page 7 of 7 PageID #: 838
Case: 23-2139     Document: 16     Filed: 01/02/2024     Pages: 98
AO245B(Rev 02/16) Judgment in a Criminal Case                                    Judgment Page 7 of 7

DEFENDANT: Tony Cushingberry, a/k/a Tony Cushingberry-Mays
CASE NUMBER: 1:20CR00112-001

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☐ Lump sum payment of $ _____ due immediately, balance due
☐     not later than _____, or
☐     in accordance with     ☐ C,  ☐ D,  ☐ E, or ☐ F below; or

**B** ☒ Payment to begin immediately (may be combined with ☐ C, ☐ D, ☐ F or ☐ G below); or

**C** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ If this case involves other defendants, each may be held jointly and severally liable for payment of all or part of the restitution ordered herein and the Court may order such payment in the future.  The victims' recovery is limited to the amount of loss, and the defendant's liability for restitution ceases if and when the victims receive full restitution.

**G** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐     Joint and Several

| Defendant and Co-Defendant Names and Case Numbers *(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee |
|---|---|---|---|
|  |  |  |  |

☐     The defendant shall pay the cost of prosecution.

☐     The defendant shall pay the following court cost(s):  _____

☒     The defendant shall forfeit the defendant's interest in the following property to the United States: **a Glock, model 19 Gen 5, 9mm Luger caliber semiautomatic pistol, bearing serial number BGUK332, and any ammunition.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

UNITED STATES OF AMERICA,   )
                        )
       Plaintiff,     )
                        )
vs.                  ) CAUSE NO. 1:20-cr-00112-JMS-KMB
                        ) Indianapolis, Indiana
TONY CUSHINGBERRY (01),    ) Wednesday, May 31, 2023
A/K/A TONY CUSHINGBERRY-MAYS, ) 1:00 o'clock p.m.
                        )
       Defendant.     )

Before the
HONORABLE JANE MAGNUS-STINSON

TRANSCRIPT OF SENTENCING HEARING

APPEARANCES:
FOR THE GOVERNMENT:    United States Attorney's Office
                    By:  Peter A. Blackett and
                    Jayson W. McGrath
                    10 West Market Street, Suite 2100
                    Indianapolis, Indiana 46204

FOR THE DEFENDANT:     Indiana Federal Community Defenders
                    By:  Joseph Martin Cleary
                    Dominic David Martin and
                    Sara Varner
                    111 Monument Circle, Suite 3200
                    Indianapolis, Indiana 46204

ALSO PRESENT:         The Defendant in person.

COURT REPORTER:       Jean A. Knepley, RDR, CRR, CRC, FCRR
                    46 East Ohio Street, Room 301
                    Indianapolis, Indiana 46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
COMPUTER-AIDED TRANSCRIPTION

1    *(In open court.)*

2    THE COURT:  We are here under Cause No. 1:20-cr-112.

3    This is the case of the United States v. Tony Cushingberry.

4    Mr. Cushingberry is present in person with counsel, Ms. Varner,

5    Mr. Martin, Mr. Cleary.  The Government is present by Assistant

6    United States Attorneys Peter Blackett, Jayson McGrath, and

7    Joseph De St Jean from the United States Postal Service.  There

8    he is in the center.  Okay.  The Court has been assisted by

9    probation officer Ryan Harrold, who prepared the presentence

10   report; and our court reporter is Jean Knepley.

11        So this matter is before the Court for sentencing.

12   Previously Mr. Cushingberry pled guilty, and the Court accepted

13   that plea just a little under a year ago.  Does your client

14   wish to proceed with sentencing, Ms. Varner?

15        MS. VARNER:  Yes, Your Honor.

16        THE COURT:  All right.  Is the Government prepared to

17   proceed?

18        MR. McGRATH:  Yes, Your Honor.

19        THE COURT:  All right.  So the Court has reviewed

20   before today's proceeding the following documents:  The

21   presentence report that was prepared in final form at

22   Docket 79, and I note that that has been of record since August

23   of last year.  Does your client -- did your client receive it

24   more than 35 days before today's date, Ms. Varner?

25        MS. VARNER:  Yes, Your Honor.

1          THE COURT:  All right.

2          And the court has reviewed the following documents in

3    advance of hearing -- of the hearing today:  The victim impact

4    statements submitted by the Government at Docket 89 are what

5    the Court would consider the actual victim impact statements

6    from the family of the decedent.  And then, dozens of letters

7    were submitted by the Government, mostly from the U.S. postal

8    community concerning the matter before the Court at this time.

9          Defendants submitted sentencing memorandum at

10   Docket 95, which the Court has reviewed.  In addition to that

11   memorandum and in support of that memorandum, the Defense also

12   submitted a U.S.B. with a video presentation that the Court has

13   reviewed.

14         The Court reviewed the memorandum in support of

15   sentencing submitted by the Defense at Docket 98, and then,

16   responsive to an argument raised by the Government, the Defense

17   submitted last night submission in support of sentencing at

18   Docket 108, which I have also reviewed.

19         The Government's sentencing memorandum, in addition to

20   the victim impact statements, was submitted at Docket 102, and

21   the Court reviewed that document as well.

22         Are there any other documents for the Court to

23   consider, Mr. McGrath?

24         MR. McGRATH:  No, Your Honor.

25         THE COURT:  Ms. Varner?

1      MS. VARNER:  No, Your Honor.

2      THE COURT:  All right.  Ms. Varner, have you and Mr.

3  Cushingberry read and discussed the presentence report?

4      MS. VARNER:  We have, Your Honor.

5      THE COURT:  Is it accurate?

6      MS. VARNER:  It is.

7      THE COURT:  Are there any objections?

8      MS. VARNER:  None.

9      THE COURT:  Are there any for the Government?

10     MR. McGRATH:  No objections, Judge.

11     THE COURT:  I should note, and I believe staff

12  notified counsel this morning, referenced in the presentence

13  report is an incident from Clark County, and the Court reviewed

14  the probable cause affidavits, as well as photos and a video

15  from that incident.  And counsel were so advised; is that

16  correct, Mr. McGrath?

17     MR. McGRATH:  That's correct, Judge.

18     THE COURT:  And Ms. Varner?

19     MS. VARNER:  Yes, Your Honor.

20     THE COURT:  Thank you.

21     So there are no objections to the PSR, and I want to

22  direct everyone's attention to the conditions of supervision

23  contained in the PSR.  They are found at Paragraphs 63 and 64.

24  These will be the rules of supervision that would govern Mr.

25  Cushingberry if he is placed on supervised release.

1       Ms. Varner, have you and Mr. Cushingberry carefully

2 reviewed these conditions?

3       MS. VARNER:  We have, Your Honor.

4       THE COURT:  Do you have any objections to them?

5       MS. VARNER:  We do not.

6       THE COURT:  Are there any objections for the

7 Government, Mr. McGrath?

8       MR. McGRATH:  No, Your Honor.

9       THE COURT:  All right.  Mr. Cushingberry, do you agree

10 that you have reviewed these proposed conditions?

11       THE DEFENDANT:  Yes, ma'am.

12       THE COURT:  All right.  And the probation officer has

13 included the reasons why he is recommending these conditions.

14 I agree with him, that these conditions are appropriate for you

15 and that his reasoning is sound.  Do you believe you understand

16 them?

17       THE DEFENDANT:  Yes, ma'am.

18       THE COURT:  You have the right to have me read each of

19 them to you as I pronounce sentence, or if you believe you

20 understand them and why they are being imposed, you can waive

21 that right.  Do you wish for me to read the conditions when I

22 pronounce sentence?

23       THE DEFENDANT:  No, ma'am.

24       THE COURT:  I will accept your waiver of the formal

25 reading and will also tell you, Mr. Cushingberry, these

1  conditions will be included in writing in the judgment that
2  will be issued by the Court.  So you will always have a written
3  copy of them, all right?
4          THE DEFENDANT:  Okay.
5          THE COURT:  The Court will also accept the presentence
6  report as its findings of fact, accepting the report for the
7  record under seal.  In the event of any appeal, counsel will
8  have access to the sealed report but not to the recommendation
9  portion, which shall remain confidential.
10         Within the presentence report, if we all, then, could
11 turn to the guideline calculation.  It begins on page 6 at
12 Paragraph 16.  For the charge of murder in the second degree
13 and protection of an employee of the United States, the base
14 offense level is 38.
15         In Paragraph 18 there is a six level victim-related
16 adjustment, given the employment of the victim as a United
17 States postal letter carrier.  So the adjusted offense level is
18 44.  The Defendant has clearly demonstrated acceptance of
19 responsibility by pleading guilty, so the offense level is
20 decreased by two levels.  And upon motion of the Government,
21 because the Defendant pled guilty in a timely way, a third
22 level would be reduced.
23         Is the Government making that motion?
24         MR. McGRATH:  Yes, Judge.
25         THE COURT:  All right.  So that third level will be

1    taken off, which will result in a total offense level of 41.

2           The second half of the guideline calculation is based

3    on Mr. Cushingberry's criminal history; he has none.  His total

4    criminal history score is 0.  That places him in criminal

5    history category I.  So at a level 41-I, the guideline range is

6    as follows:  A term of imprisonment of 324 to 405 months,

7    supervised release of two to five years, a fine of 50,000 to

8    $250,000, and a special assessment of $100.

9           Counsel, do you agree that is the correct calculation,

10   Mr. McGrath?

11          MR. McGRATH:  Yes, Your Honor.

12          THE COURT:  And Ms. Varner?

13          MS. VARNER:  Yes, Your Honor.

14          THE COURT:  All right.  The Court will adopt that,

15   then, as its guideline calculation.

16          My understanding, Mr. McGrath, is that there is a

17   witness who wishes to be heard from the Government's side?

18          MR. McGRATH:  That's correct, Judge.

19          THE COURT:  I always find it -- I think it is more

20   appropriate if the Defendant's opportunity for allocution

21   follows that, so consideration of that statement can be

22   included.

23          MR. McGRATH:  I understand, Your Honor.

24          THE COURT:  All right, thank you.  So --

25          MR. McGRATH:  Your Honor, I have just been informed

1  that there has been a change.

2          THE COURT:  Okay.

3          MR. McGRATH:  We were going to call Miss Melanie Davis

4  to the stand, and she was essentially going to read her victim

5  impact statement.  I have been asked to read that into the

6  record, and I would beg the Court's indulgence for that at this

7  time.

8          THE COURT:  Go ahead.

9          MR. McGRATH:  Thank you.  This is the letter from

10  Melanie Davis filed at Docket 89-2, and this is Miss Davis in

11  the purple shirt next to Miss Lloyd.

12          THE COURT:  Thank you.

13          MR. McGRATH:  I have been unsure how to express

14  myself, but I think Angie would appreciate cutting straight to

15  the main point.  I watched our daughter, KD, utterly implode

16  when my brother called me and asked if the coroner had gotten

17  ahold of me yet.  A girl of dreams and open possibilities and

18  deep compassion who had been overcoming a life of medical

19  issues, a teen who was looking at becoming a mental health

20  professional or maybe a mathematician or some career related to

21  law, a smart mouthed and vexingly honest child was lost in that

22  moment.  Our baby, who we nursed through three major spinal

23  surgeries who was supposed to die by age nine due to her

24  condition but survived beyond the experienced neurosurgeon's

25  most brazen hopes, our miracle child in so many ways, was

1    gunned down as thoughtlessly as Angie was.

2           I held her through her screams of sorrow and fear as
3    we both sobbed for hours and all the days afterward when the
4    realizations hit and the blessedly protective numbness faded
5    into raw realities and every time she didn't get the expected
6    texts or calls.  I watched her withdraw into an icy darkness,
7    not wanting to interact with one more person and perform her
8    sorrow in ways they expected her to.  She wanted to grieve in
9    private --

10          THE COURT:  Go ahead.

11          MR. McGRATH:  -- but the circumstances did not allow
12   that.  We had three services for her to accommodate all the
13   people who wanted to pay their respects.  Two were mostly for
14   show with empty rented coffins because we'd buried Ang during
15   the first one held for friends and family.  KD sat at them all
16   and thanked people for coming and smiled, nodding as they
17   poured forth their condolences and prayers and recounted their
18   happiest memories of Angela.

19          In the times between the work of memorialization and
20   beginning the awful logistics of packing away the detritus of a
21   dead parent's life, recounting having just been there in that
22   space with Angela and cleaning the dishes she left in the sink
23   from the morning she was killed, KD read news articles that
24   popped up across the country and outside it in newspapers and
25   social media.

1    Most articles were benign or sympathetic, but she also
2    read the comments, some blaming Angie, some blaming race, and
3    some blaming the dogs that caused her to have to stop
4    delivering the mail in the first place.  On top of the surreal
5    situation, doing the hard work of packing away things and
6    emotions, being preternaturally strong in the face of it all
7    and navigating the emerging COVID threat, KD was being
8    traumatized over and over by mischaracterizations of Angela and
9    all the absolute worst that disconnected people can say in the
10   face of a tragedy.

11   She shut down after the memorial motorcycle ride.  Her
12   easy laughter and smile were gone.  She didn't reach out to
13   even her closest friends.  For a whole year she occupied the
14   sofa, sometimes watching TV, sometimes reading, only
15   occasionally eating, and Skyrim, the video game she had begun
16   playing at Angela's made decreasing appearances.

17   She stopped going to therapy and didn't stick with
18   schoolwork when virtual learning came on the next year.  The
19   next year she took a couple months off for mental health days.
20   This year she caught COVID and had what I hope is her final
21   surgery to realign her partially paralyzed leg.  There was no
22   cushion for the unfortunate disruptions, and we were told in
23   November that she would have to withdraw from school and get
24   her equivalency diploma.

25   In December we signed a paper, and KD is no longer a

student and far short of her goals.  I am just glad she is
still here, but she feels the seeming finality of an education
ripped away as well.

Angela was gone, but KD became the ghost, and much of
the time she still is.  So many people have been trying to
help, and she has a great network of people on her side
encouraging and supporting her.  That helps.  She has a
therapist she sees regularly again, but leaving the house for
anything other than school still requires cajoling and promises
of fast food.

Her interests in most things she once enjoyed is gone.
KD exists.  At 17, now, she has shown no interest in learning
to drive or meet up with friends outside of school.  There is
one exception.  She did discover Korean dramas and has been
teaching herself the language, culture, and history with the
goal of traveling there after school.  It is not what I
expected, but having spent years in the dark void, any light is
welcome.  And her innate compassion is still evident.  Even
after losing so much, she still doesn't even want to ask for a
life sentence for Angie's murderer.  She doesn't feel it is her
place to ask for punishment.

Her own future, being so hard won against the odds
from her spinal cord tumor and its grievous physical fallout,
as well as growing up in poverty was something she was looking
toward with hope, but that was stolen from her by the one

1    stupid decision made in a milieu of generational trauma,
2    systemic oppression, ignorance, lack of opportunity, poor
3    impulse control, and absent hope for a better future.  I have
4    empathy for Tony Cushingberry.  I heard his life was not the
5    best, but that doesn't justify, excuse, or explain his
6    conscious decision to threaten, intimidate, and attack Angie.
7    His brain still hasn't finished developing, but he knew better
8    than that.

9        He let himself succumb to the basest of his impulses,
10   and in the seconds of that encounter, he took many lives beyond
11   Angie's, including his own future and that of his now
12   three-year-old son.  Does he get that?  Can he genuinely
13   recognize the lasting and expanding traumas he inflicted?  The
14   plea deal was crafted to remove the mandatory minimum.  It's a
15   calculated tactic to possibly evade a harsher sentence, and
16   that reflects a selfish desire for self-preservation and harm
17   reduction, not the existence of remorse or even scarce evidence
18   of a conscience.

19       I still don't know what I think would be fair for
20   sentencing, whether it is punitive for the guilty or protective
21   of the public in nature, what the right course would be.  I
22   don't know Mr. Cushingberry to gauge his character, his mental
23   and emotional state, and I cannot look into his future to see
24   how he would make use of his time in incarceration.  He should
25   be grateful, though, that it is not up to me to decide his

1    fate, because I have years of sorrow and rage pent up for what

2    he took, but no punishment can restore what we have lost.

3    Thank you.

4         THE COURT:  So Mr. Cushingberry, you have the

5    opportunity to make a statement.  It is called an allocution,

6    and this is your opportunity.  And now would be the appropriate

7    time to speak on your behalf.  It is no disrespect, but because

8    of the microphone, you can remain seated, okay?

9         THE DEFENDANT:  Okay.

10        THE COURT:  Go ahead, please.

11        THE DEFENDANT:  Your Honor, I appreciate the Court's

12    time and opportunity given to me to speak.  I would --

13        THE COURT:  Let me just say one thing.  I know you are

14    nervous and you are reading, but you need to slow down.  When

15    we read, we speak very quickly.  So I am going to ask you to

16    please make sure you slow down so that everything you say can

17    be both taken down by the Court Reporter and heard by everybody

18    who is here.  All right?

19        THE DEFENDANT:  Okay.

20        THE COURT:  Thank you.

21        THE DEFENDANT:  Your Honor, I appreciate the Court's

22    time and opportunity given to me to speak.  I would like to

23    start by apologizing, but I know that an apology wouldn't be

24    enough to heal the hearts that I have broken or even explain

25    the deepest sorrow I have.  I am truly sorry.

I want to apologize to Angela Summers and her family for this nightmare we all have to live and go through with for the rest of our lives.  My heart and prayers go out to Ms. Summers' daughter.  I can't imagine the pain and tears my actions has brought you.  I know it probably won't help or make things better, but I literally go through a lot physically, mentally, and emotionally when I think about you.  I cry, I stress, and on top of that, there will be days I won't even eat.

The pain really eats me up on the inside.  Losing a parent, especially a mother, has to be the worst challenge to overcome in life.  My father missed the first 15 years of my life because he committed a crime and was sentenced to prison.  His absence plays a big role in my life, but it brung me and my mother closer.  I know it's no comparison because my father is still here, but I struggle today knowing that I took any chances away from you having a relationship with your mother.

Reading your letter affected me a lot.  I'm very sorry to hear about your problems at home and at school.  I am sorry that you feel pain when you hear my name, and I hope after today that your life gets easier.

I wish I could go back and change everything, but I can't.  All I can do is move forward and try to better myself, which I am already on a good path of doing so.  And I hope you can do the same as well.  I wish I had the words to explain the

deep -- I wish I had the words to explain the remorse I really feel for you and your family, but as a man with regrets, the best thing to do would be apologizing.  My heart and prayers go out to you.  I pray for you every night.  I am truly sorry to your family and to the people I hurt and let down.  I hope you can find in your hearts to forgive and accept my apology.

I also want to apologize to the postal workers.  I want to say how sorry I am to you.  I'm so sorry for taking Ms. Summers from you guys' community, and I'm especially sorry to those of you who knew her personally.  Any postal worker should feel safe when they go to work, and I'm sorry my actions made you and your families afraid.

And I want to apologize to everyone for running.  I should have stayed.  I know that made it harder for you, and I'm sorry.

Before this tragedy happened, I never been in trouble a day in my life until I found myself locked up in segregation in Marion County Jail.  My cell was the size of a small closet. I could stick my arms out to the side and touch wall to wall. Not only my cell, but the whole environment was dirty.  There was literally human feces on the walls and bars.  I was locked in my cell 23 hours a day, sometimes 24 hours.  I was isolated and cut off from everyone.

It was literally the worst time of my life but not because of these reasons.  It was the worst time in my life

1   because I couldn't think about anything except what I had done
2   to Ms. Summers, to her daughter, and to Ms. Summers' family and
3   to my family.

4       I thought about it so much I would wake up in cold
5   sweats from nightmares I would have when I would see
6   Ms. Summers in my dreams.  I had to accept and surrender to
7   everything I was going through.  I felt like this was my
8   punishment for what I had done.  When I had first arrived in
9   segregation at Marion County Jail I was walking down the range
10  when a man stuck his arm out through the bars and handed me a
11  Bible.  I never seen or met the man before, but I knew it was a
12  sign from God.

13      I took it into my cell and began to read it.  Not only
14  did I start turning to it, I started to turn to God.  Reading
15  the Bible gave me hope again.  It made me believe things would
16  get better, and I have held on to that hope.  I believe
17  everything happens for a reason, but I don't know why this
18  happened to both of our families.

19      But what this has given me is time to think.  I know
20  this is a beginning of a long journey for me.  It has been the
21  first time I actually been able to really think about my past,
22  and it helped me realize how rough I grew up and many obstacles
23  I overcame.  My entire life revolved around hope.  Me, my
24  mother, and little siblings struggled and lived rough my whole
25  life.

1    We lived hoping that things would get better.  Through

2    all the trials and tribulations we faced growing up, I still

3    tried to step up and be the man of the house and a big brother

4    to my little siblings.  I was the glue to my family since I can

5    remember.  I was always there for them when they needed me.  I

6    really tried to be a helper to my family, to my mom, to my

7    siblings, and friends.  With that being said, Your Honor, my

8    biggest fear today is being seen as this one day.

9    But no matter what happens here today, I am going to

10   continue living with hope, and I'm going to do that by doing

11   things that would help better me and my son's future.  I have

12   already started while being in Clark County Jail by taking

13   classes and programs such as mindfulness program, the WIN

14   program, and parenting class.  Even though this is the

15   beginning, I know this is not the end of my journey.  I want to

16   help kids in the community that grew up similar to what I did

17   and that is also afraid to talk to anyone about it.  I want to

18   be a mentor and counsel the kids in the community into making

19   better choices in life.

20   When I get to prison, I want to take trades and

21   classes that would help me succeed in my future goals I have

22   planned.  With this being said, I believe I should try to get

23   my bachelor's degree.  I really want to continue learning about

24   myself so I can work towards a better future.  I am willing to

25   take classes or programs for healthy thinking or counseling if

1   it's available.

2          I plan on taking parenting classes because I want to
3   be the best father I can be for my son.  I also want to try to
4   take a trade, an electrician, or maybe getting my CDL license.
5   I am not going to let this experience turn me into the person
6   everyone thinks I am.  I am determined to make me and my family
7   proud.

8          Your Honor, I want to end this letter with apologizing
9   to the love of my life, Nikayla.  I am sorry for leaving you to
10  fend for yourself and our son.  I know this is -- I know this
11  is not what we had planned in our future, but I am still going
12  to do my best to keep the promise I made you.  And that was to
13  support and be there as much as I can for you and our son no
14  matter what.  You two mean the world to me, and I love you-all
15  so much.

16         To my one and only son, Baby Tony, I'm sorry for
17  putting our lives on pause.  Since the day you were born my
18  intentions was to never leave your side.  My main motive and
19  focus was to give you a better life and future than I had
20  growing up.  I wanted to be the father to you that I never had
21  growing up, but I am never going to give up on that no matter
22  what happens here today.  I am still going to be the best
23  father as I can be and try to have as much impact and influence
24  on your life as I can.  I want you to know I always have and
25  always will love you and wanted the best for you and your

1  mother.

2        And again, to the Summers' family, to Ms. Summers'

3  daughter, and the postal workers, I am really sorry.  And I am

4  living with this and taking full responsibility for it every

5  day.  I hope you can forgive me and accept my apology.  Thank

6  you.

7        THE COURT:  Thank you, Mr. Cushingberry.

8        Ms. Varner.

9        MS. VARNER:  I would like to start today by offering

10  my sincere condolences to Angela Summers and to her colleagues

11  at the post office.  I want you to know that nothing I say here

12  today is meant to diminish your loss in any way or take away

13  from your grief.  From the submissions in this case, it is

14  clear to me that Angela Summers was loved and that she will

15  continue to be missed.  What I am trying to do today is to give

16  the Court and the people in this room the fullest possible

17  picture of who Mr. Cushingberry is, where he came from, and how

18  we got here.

19        Almost exactly a year ago today my dad died.  I went

20  on a trip to Ohio with my kids to celebrate the end of the

21  school year, and we visited Kings Island for the day.  And I

22  got -- my phone rang.  I couldn't hear.  It was my mom.  I

23  couldn't hear anything that she was saying, and as I searched

24  for a quieter place to take the call I got a call from my

25  sister.  And my sister told me my dad had fallen, that he had

1  been taken to the hospital, but that he hadn't made it.  I sat

2  down on the ground in total shock as my little girls surrounded

3  me, and losing my dad has been one of the hardest things I have

4  ever had to face in my life because my dad was my rock.  My

5  parents divorced in the early 1980s when my dad got tired of

6  coming home from work and finding me locked out of the house

7  and decided that my mom's addiction was not going to stop.

8  So it was just me and my dad for a while, and as he

9  told me, we are a team.  And even after my dad got remarried,

10  we were a team.  Even as an adult, we were a team.  When Tony

11  was 19 months old, his father, Anton, went to prison, and Tony

12  stayed with a traumatized and drug-addicted mother in his life,

13  Acacia.  That didn't make his bond with his mom any less real

14  than the bond that I had with my dad.  Acacia was all that Tony

15  had, and Acacia loved Tony.  She still loves Tony.

16  I have spent many hours with Acacia and watched her

17  cry over her son, and when Anton left the picture,

18  dysfunctional and toxic as it was, Acacia and Tony were also a

19  team.  I think it is really important for us today, as we are,

20  like, sifting back through Tony's history and we are looking

21  for guideposts in his life as to how we ended up here today for

22  us to take a minute to realize that Acacia didn't start the

23  dysfunction in this family.  Like so many of the stories that

24  are told in this courthouse, this is a story that involves deep

25  poverty, drug abuse, domestic violence, teen pregnancies, and

1   childhood neglect and abuse.

2        Acacia's mom, Amy, lived in a house where she doesn't
3   have any memories of her father ever being sober.  Some of her
4   most vivid memories of her father are of his father laying out
5   drunk in the yard after drinking too much, and that was normal.
6   Amy also lived in a house with a mother that was verbally and
7   physically abusive.  She was choked, punched, and most
8   devastatingly, Amy, she felt like she received no love from her
9   mother.

10        She was pregnant with Acacia by the time she was 14,
11   and she was desperate to leave her toxic house.  Amy herself,
12   then, became an alcoholic, and Tony's mom, Acacia, also grew up
13   surrounded by drug abuse and domestic violence.  Among the many
14   violent acts that she witnessed when Acacia was seven, she
15   watched as her boyfriend -- her mother's boyfriend tried to run
16   her mother over with a truck as she screamed and cried from the
17   porch.

18        When Amy finally got the strength to leave her abusive
19   partner for a period of time and they went back to live with
20   Amy's parents for a while, Acacia remembers watching her
21   grandmother slam her mother against a wall and choke her.

22        Repeating a cycle, traumatized Acacia was also
23   pregnant at 15 and desperate to leave her mother's toxic house.
24   When Tony was born, Acacia wanted to protect him from the
25   things that she had suffered.  She wanted better for him, but

1   she lacked the tools.  Trying to scrape by at that young age
2   and with Tony in tow, she was arrested for shoplifting, and
3   that was just going to be her first contact with child
4   services.

5         During Tony's childhood, there would be at least 24
6   cases opened with child services.  With not even a high school
7   education and making minimum wage, of course, Acacia started to
8   bounce around from house to house as she couldn't afford the
9   rent.  Acacia had at least 25 evictions during Tony's
10  childhood, and they had at least 30 addresses that we could
11  count.

12        And most times the houses or the apartments that they
13  were able to rent were just abysmal.  They had no electricity,
14  sometimes no gas, sometimes no working utilities at all.  There
15  were times when they had to use space heaters in the winter to
16  stay warm.  There was often no food in the fridge, and as
17  Acacia bounced around between houses, of course, Tony was
18  bouncing around between schools.  He attended ten schools in
19  eight years.  He often missed school, he was often tardy.

20        By the time Tony was seven, Acacia was pregnant again,
21  and she was, then, living her own life of domestic violence.
22  Tony routinely witnessed his mom getting beat up by a 6 foot 2,
23  240-pound Darryl Taylor.  He saw his mom kicked, punched,
24  thrown to the ground.  He saw his mom beaten when she was
25  pregnant.  He couldn't -- Tony was tiny.  He couldn't do

anything to help her, but he did try.  Tony used to sit out on
the front stoop and keep watch for Darryl and try to warn his
mother that he was coming home.  When the fighting -- he would
also try to help her barricade the door against Darryl when
Darryl was angry, but Tony was small.  When the fighting really
started, the only thing Tony could do was hide.

Darryl was arrested eight times during their
relationship for domestic battery, battery with injury,
burglary, theft, intimidation, but Acacia was scared of him and
rightly so.  And Acacia never pressed charges.

Adding to what was already a home that was filled with
chaos, between the ages of seven and nine, Tony added a new
sibling every single year.  Every one of the siblings was
positive for drugs, and as the DCS cases opened and closed
around those births, Tony was interviewed, and Tony did what
his mother told him to do and he stayed silent.  What happens
in this house stays in this house, his mother told him.

And as those new babies were coming, Acacia had to
work, and Acacia often worked nights.  And Tony was left to
care for those babies.  Acacia would leave bottles and diapers
on a nightstand for him, and then, Tony would take care of a
two year old, a one year old, and an infant.  I am a mother,
and I know Your Honor is a mother and I simply cannot imagine
that.

I have nine-year-old twins right now.  One of my twins

1  is a little more responsible.  I can't imagine giving her one

2  baby to care for, let alone having three babies overnight.  To

3  put it all in the hands of a little kid like that is

4  terrifying, but Tony was happy to help his mom.  It is no

5  surprise that in the pictures that DCS took over the years,

6  Tony is often holding one of these little baby siblings and

7  beaming with pride.  He loved his siblings.

8       Acacia's relationship with Darryl ended when he was

9  sent to prison for 12 years for robbery.  Less than a year

10  later, 27-year-old Acacia began a relationship with 18-year-old

11  Paris Duncan, who was dating Acacia's teenage sister at the

12  time.  Paris was also horribly violent, and Paris and Acacia

13  fought night and day.  Like Darryl, Paris was arrested 14 times

14  during their relationship, and most of those arrests were for

15  battery.

16       Again, Tony saw his mom routinely beaten.  He saw

17  Paris break and throw things around their home, and when Tony

18  was 11, Paris and Acacia exposed him to a shooting.  Paris had

19  broke into a neighbor's house, and the neighbor came to

20  confront Paris with a shotgun.  Paris and Acacia threw Tony in

21  the backseat where he was huddled in the backseat of the car

22  and took off as bullets were flying.

23       That incident finally ended when the police surrounded

24  their car and pulled everyone out at gunpoint, and 11-year-old

25  skinny little Tony was pulled out of the car shaking with guns

1  pointed at him.   There were times that the fighting was so bad
2  that Tony had to call the police.   During one fight Tony was
3  bitten by Paris, that he tried to keep Paris from attacking his
4  mom.

5       Tony was handcuffed for the first time when the police
6  arrived to arrest Paris, and Paris barricaded himself in the
7  house, trapped the kids up in the bedroom, and was trying to
8  evade the police.   When the police broke down the door Tony was
9  handcuffed and put on the floor, and before Paris surrendered
10 himself, he held up their youngest child, Paris' own child,
11 Tony's youngest sibling, his three-year-old child as a shield.
12 On top of trying to save Acacia from Paris, Tony was also
13 trying to protect his siblings.   He was also trying to save and
14 protect Acacia from herself.

15      Acacia -- by the time Acacia was with Paris, Acacia
16 was a full-blown alcoholic herself.   She was buying vodka by
17 the gallon.   When Tony was 12 she was pregnant again, and she
18 was still drinking heavily.   And Tony tried to stop Acacia one
19 night.   He was worried about her, and most tellingly, he was
20 worried about his unborn baby sibling.

21      In response, Acacia shoved him through a glass window
22 on their front porch, cutting the skin and muscle on his arm.
23 That baby, Tony's fourth sibling, was also born drug positive.

24      Another night he tried to stop his mother from
25 fighting with a woman on the street.   She had gotten into an

1    altercation with a neighbor.  He was worried because he knew
2    that these fights in the neighborhood could easily become
3    fatal.  So he went outside, and a 15-year-old Tony flung his
4    mother over his shoulder and carried her, drunk and
5    belligerent, into the house, only to have her go right back
6    outside and keep fighting.  That night Acacia was arrested, and
7    Tony did what Tony has always done.  He took care of the kids.

8        When Tony was 17, Acacia had her fifth drug positive baby,
9    and by this point Tony had long been the functioning adult in
10   this household.  For years at this point he had cooked
11   breakfast, he had cooked dinners, he had done laundry, cleaned,
12   given baths, helped with homework.  He did hair.  He packed
13   snacks.  He got them off to school and daycare.

14       The siblings described Tony as having been a mother and
15   father to them.  Over the years there were some moments of
16   reprieve for Tony.  Tony was able to meet his father's family,
17   and they welcomed him with open arms.  Tony was sometimes
18   allowed to spend time at their house, and even though they
19   lived in Section 8 housing, Tony thought they were rich because
20   they had bedrooms to themselves.  They had food in their
21   refrigerator, and their mom took them to do fun activities
22   sometimes.

23       And when he was 15, Tony was able to meet his biological
24   father when he was released from prison, and he was thrilled to
25   have Anton back in his life.  But he stayed characteristically

silent about the things that were going on at his house.  There
were short periods of time when he lived with his grandmother,
his maternal grandmother, and these breaks did allow Tony to
focus on school and to just take a break from what was going on
in his house.

School and basketball were also a reprieve for him.  From
an early age, from first grade, Tony would sometimes wake up
before his mom in the morning and get himself out of bed and
get himself ready for school.  He did get dressed, brushed his
hair, brushed his teeth, get his breakfast, and be ready to go
because Tony loved school.

School represented a place of normalcy for him and a place
where he didn't have to be afraid, and on the basketball court
was a place where Tony truly excelled.  He was a natural.  He
was very talented.  He used to play in a neighborhood center
where he played three-on-three basketball.  He was so good he
was invited to go to national tournaments.

He played on teams that the schools that he attended, and
as a high schooler at Crispus Attucks, he was being scouted for
college ball.  Tony's teachers and coaches loved him.  He left
a lasting impression on both them and the other students he
went to school with.  He was a laid back and funny kid with an
easy smile, and he was known to be a peacemaker.

Tony didn't like when people were picked on, whether you
were a student or a teacher, and Tony used his status on the

1   basketball team to help keep the other kids in check.  He
2   stepped in when he saw teachers or students being picked on.
3   Unfortunately for Tony, he blew out his knee in his sophomore
4   year.  He was able to play in his junior year, but by his
5   senior year he was told that is it.  You have got to stop, or
6   you are going to face permanent injury.

7       In the grand scheme of things, those reprieves for Tony
8   were just not enough.  Tony was resilient, but in the face of
9   so much chaos, like resilience, you can only get a child so
10  far.  Ultimately, the driving force in his life was the toxic
11  relationship with his mother.  Tony could not stay away because
12  Acacia wouldn't let him.  Acacia wanted him home, and Tony
13  could not withstand that kind of pressure.

14      During his senior year, his basketball dreams had been
15  crushed.  Tony started arriving late to school and missing
16  school, leaving early, because Acacia wanted him for childcare.
17  But Tony did it for her.  They were a team, after all, and at
18  18, Tony became the first one in his family to graduate from
19  high school.  As Tony was graduating, Acacia found a new way
20  that she wanted him to protect her.  She wanted him to get a
21  gun, and Tony did.

22      After high school, when the basketball dreams were gone and
23  he didn't have school to focus on, Tony struggled.  All of the
24  positive and wonderful influences that he came in touch with
25  through school, his coaches and his teachers and his friends

were gone.  But at 19, Tony found out that he was expecting a
child.  Tony's long-term girlfriend, Nakayla Lee, was pregnant
with their first baby, and Tony really found for himself a new
purpose in fatherhood.

He went to every doctor's appointment.  He catered her
through her pregnancy.  He never left her side during labor,
and having parented already, Tony was prepared for the
challenges of a newborn, and he helped teach Nakayla how to
care for their baby.  And when they had to make a decision
between who was going to go back to work and how they were
going to manage childcare for the baby.  Tony, at that young
age, became a stay-at-home parent, and it was a role that he
loved and took to immediately.

He and baby Tony were glued together.  That is what people
told me.  They were glued together.  You always saw them
together.  The stressors at that point on Tony were continuing
to increase.  Tony was already the parent in his mother's
house.  He had also promised to help his Aunt Taylor with her
baby.  She had a little son, and he would help her by
baby-sitting or helping with bills if he could.  And he was
determined to be a father figure for her son.

Tony was the go-to person in his family:  His grandmother,
his mother, his cousins, his aunts, his uncles.  If somebody
had a problem, they were going to go to Tony.  They depended on
him, and he was also a new father himself.  And he was hoping

1    to move out and start his life with his baby, but in October of
2    2019 his mother received another eviction notice.  And the only
3    home they could find that they were able to afford was on Denny
4    Street, which is another dangerous neighborhood in Indianapolis
5    where hearing gunshots is like a daily occurrence.

6        Tony moved his family in in December, and though Tony
7    wanted at that point to move out and to be with Nakayla and
8    have his own home with his family, Acacia guilted him into
9    staying, telling him, "How can you leave me and your siblings
10   alone here?"  Tony relented.

11       Three months later in March, the COVID-19 global pandemic
12   began, and that really was a unique time in history.  Families
13   were stressed.  Families were facing disruptions in their kids'
14   education.  I myself had four kids at home all of a sudden for
15   the foreseeable future.  Families faced disruptions in their
16   childcare for the same reasons.

17       Kids weren't eating at school.  Families' budgets were
18   stretched.  Job losses, being told you needed to work if you
19   were essential, fears over getting sick.  Many people who have
20   never suffered from anxiety or depression began to suffer
21   during that time.  The World Health Organization estimates that
22   there was a 25 percent increase in anxiety and depression, and
23   it is at this point we are racing towards April 27th, and
24   tensions were already high.

25       The week prior, Acacia had yelled at and threatened Angela

Summers.  On the morning of the 27th, Tony's day started with a phone call from his mom.  Her car had broken down.  She needed to go to Auto Zone to get a battery for her car.  She needed Tony to come pick up two of his siblings.  Tony went.

As soon as he got back home his phone was ringing again. This time he could hear yelling in the background.  Acacia had gotten into a fight with her sister and had been thrown out of the car that they were in.  He needed -- she needed Tony to come and get her.  Tony went.

After he got Acacia calmed down and got her back in the car, they went to Acacia's mom's house to see if Acacia's sister had gone there with the battery.  She hadn't, but in that short period of time Acacia got into a fight with her mother, and after he got Acacia back in the car again, Acacia wanted to go over to her cousin Tiffany's.  Tony took her.

Acacia and Tiffany decided that they wanted to have a drink together.  First, they needed Tony to drive them across town to pick up tools to fix the car.  Tony took them.  On the way home, they wanted Tony to take them to the liquor store.  Tony took them.

After Tony got the group dropped off on Denny Street, Tony started trying to sort out the missing battery.  He texted his aunt, asking, "Can I come over?  If I don't bring Acacia, if I don't bring mom with me, can I come over and get the battery?" She agreed.  So Tony went to get the battery.

1    By now, it is approaching evening, and Tony, in a twist of

2    fate, arrived home just as Angela Summers was delivering the

3    mail on the street.  His mother was angry.  She wanted the

4    mail; and Tony, as he had been doing all day, as he has been

5    doing for his entire life, stepped in to help, and tragedy

6    unfolded.

7    In that moment, when Tony pulled his gun and he shot

8    Miss Summers, the entire constellation of Tony's past converged

9    in that moment:  The complex trauma, the posttraumatic stress

10   disorder that he suffers as a result of the constant violence

11   and shootings that he had seen had left him in a heightened

12   alert and hypervigilant state.

13   In other words, Tony was one step away from fight or flight

14   at any moment, and that is because trauma lives in our bodies.

15   Traumatic life experiences, like the ones that Tony had

16   routinely, leave a physical imprint on us.  And when that

17   happens, our stress responses can look very different, like,

18   our responses -- the responses that you and I might have to a

19   stressful event might look very different than the response

20   that Tony might have.

21   And in that heightened state, when Tony was pepper-sprayed,

22   he was primed at that point to misperceive the threat to

23   himself.  His underdeveloped 21-year-old brain at the time, his

24   cognitive impairments in the areas of the brain that help us

25   make rapid decisions and that help us to control our own

1    impulses just left him with a lack of ability to understand and
2    reason through what was happening to him and make an
3    appropriate response.

4         Every parent fears the moment when their child's split
5    decision -- moment when their child's decision that is made in
6    a split second alters the course of their lives, and that
7    happened on April 27th everywhere.  With his whole life ahead
8    in one brief moment, Tony, by taking a life, altered the course
9    of many lives.

10        It occurred to me in thinking about this case how deeply
11   affected Tony and I were by our parental teams; me and my dad
12   and he and his mom.  I wasn't exposed to chronic violence and
13   poverty.  I haven't witnessed people be shot in front of me.  I
14   have never lost anyone in my life due to violence.  I wasn't
15   forced into the role of parent or protector in my home.  In
16   many, many ways, I was able to succeed because of the moral
17   compass of my father.

18        My entire life, every decision that lay before me, the
19   right decision was the easy decision.  And for Tony, that was
20   the total opposite for him.  He grew up in a system that
21   modeled violence and drug abuse, and every day the right
22   decision for him was the harder one.  And up until April 27th
23   of 2020, he was succeeding not because of but in spite of the
24   moral compass of his mother.  Tony was breaking the
25   generational cycle all by himself, and I just want to take a

moment and consider how truly remarkable that is.  Tony was
raised in an environment that made him hypervigilant, but he
was also known in his community as a peacemaker.

I just think it is remarkable that he overcame himself in a
way that many of us -- even with the benefits of time, with
reflection, with therapy, with being able to sort through our
own past, haven't been able to do.  Growing up as deeply on
faith as he did, he has still somehow demonstrated resilience
his entire life, that innate ability to just bounce back, to
adapt, to adopt a positive mind-set despite the things that are
happening in our lives.  And he has been doing that his whole
life, and he still made a deeply devastating mistake.

We all, in our lives, experience successes and failures,
but the lives that we lived made us prone to different
mistakes.  I have been free my whole life to make small
mistakes, even bigger mistakes but carefully guided by a loving
parent.

For Tony, carrying the trauma that he carries with him, one
mistake had the potential to be catastrophic in his life, and
it was.  And it was also painfully public.  Tony's biggest
failure happened on the national stage.  It was in front of
everyone who mattered:  His community, everybody he knows, his
family, Indianapolis, the entire nation.  He had to immediately
face a reckoning at that moment.  You can't go back.  You can't
change it.  You can't unbeat it.  You can't undo it.  There was

nothing left for him, and I think in that moment people made a
lot of assumptions about Tony. And I think that is pretty
normal, but privately, Tony's community was reeling.

This did not match in any way the Tony that they knew. The
Tony that they knew was a goofy and smiling kid. He was a
peacemaker. He was the kid who didn't run the streets, who
didn't get in trouble. He had never been in trouble a day in
his life -- not in school, and not in the community.

We spend a lot of time telling our clients that who they
are is not defined by their worst act. That has never felt
truer to me than it does in this case. At the end of the day
standing here today, it is difficult to accept that it took
disaster for Tony to recognize the patterns in his family and
especially with his mom.

Tony, as you heard him talk about in his statement, for the
first time, has had time to move beyond thinking and planning
for essentials and has had some time to try to make sense of
his own history. He spent a lot of time thinking about what
happened to Miss Summers and her family and what has happened
to him and realizing that he cannot go back to living life the
way that he was before.

He can't go back to his mom, to being everyone's protector,
to jumping whenever anyone needed anything, to ignoring his own
needs. That whole life is gone for him. When I first met with
Tony, that was his goal. His goal was I am trying. Whatever

happens here, I am trying some day, some how to get back to being that guy again.  Now he has realized that he has to do something new.

That piece, although it is alongside deep sorrow and tragedy, it is like being unshackled after 23 years.  And on top of doing the work on his past, Tony has been using his time, as he spoke about, to prepare himself for the hope that he might be home again one day.  He has taken every class he can.  He stayed strongly connected and bonded with his family.

He is still providing help and assistance.  He is still talking his siblings through their lives as much as he can.  He is still parenting them, and he stayed very close to Nakayla and his son Tony.  Tony hasn't let this shake his determination, as you heard him talk about, to be there in his son's life and to be the father to baby Tony that he didn't have in his life.

So to me, that is just a sign that that resilience is still alive inside Tony, and he has a plan for what he wants to do when he gets to prison.  He wants to explore college.  Lately he has been talking about being interested in counseling.  When he was a kid, he didn't feel like he could speak about what was happening to him, and he is interested in helping other kids who feel like they don't have a voice.

He is interested in doing an apprenticeship through the Department of Labor to become an electrician.  He would like to

1    participate in the BRAVE program, which is a cognitive

2    behavioral residential program for young males who are serving

3    their first federal sentence.

4        Now, after considering our submissions and hearing Tony's

5    story, we would ask this Court to impose a below guideline

6    sentence of no more than 220 months or 18 years.  That number

7    represents the mean sentence for second-degree murder that is

8    cited in our memo.  It also represents the average reduction

9    applied to second-degree murders also cited in our memo.

10        THE COURT:  Can I ask you a question about that?  The

11    means and averages cited in your memo, do you have any idea

12    what -- you have cited criminal history category but not the

13    offense level.  Do you, do you know what the offense level was

14    or whether there was an enhancement such as was applied in this

15    case?

16        MS. VARNER:  Those were not broken down, not

17    specifically on the sentencing calculator's interactive tool.

18    You could just look for the main guideline that was applied in

19    the case and then enter the criminal history category and get

20    the averages.

21        THE COURT:  Okay.  Thank you.

22        MS. VARNER:  We would suggest to the Court that with

23    no aggravators in this case other than the official victim

24    enhancement, which is already accounted for by the guidelines,

25    it would be well within the Court's discretion to go below that

1   point because this wasn't an aggravated crime.

2        In the case survey that we submitted to the Court, you

3   know, you could really get a sense of the aggravators going on

4   in these cases.  Tony wasn't planning to kill anyone that day,

5   not at all.  He is not a member of a gang or a terrorist

6   organization.  He wasn't in the midst of committing another

7   crime or trying to escape one.  He didn't engage in some sort

8   of prolonged and violent attack.  He didn't hide a body.  He

9   didn't shoot indiscriminately at police officers.

10       A sentence there also, you know, the guideline doesn't

11  take into account the mitigators that are present in this case

12  that aren't accounted for, and I think in this case they are

13  pretty stunning:  Tony's terrible traumatic childhood, his

14  chronic exposure to poverty and violence, his resulting

15  posttraumatic stress disorder, his learning disabilities, his

16  age and underdeveloped brain at the time of the crime, his

17  community support, and his total lack of criminal history.

18       And it takes into account the facts and circumstances

19  that this offense, especially as compared to the facts and

20  circumstances of the other second-degree murders that we cited,

21  when Tony was maced, his hypervigilance, and long history of

22  violence led him to misperceive the danger, and he responded.

23       In closing, I would like to say I personally have

24  spent many, many hours with Tony, and I want everyone in this

25  room, if you leave with one thing, I want you to leave knowing

1  that Tony is filled with regret, regret that he didn't
2  understand things in his life sooner, regret that he never
3  asked for help, regret that he didn't understand how broken he
4  was, regret that he has left Nakayla to parent alone, and he is
5  repeating the generational cycle that he desperately wanted to
6  avoid.

7        His little baby son Tony is growing up without him,
8  but more than anything, Tony is steeped in the regret that
9  someone's life was cut short and that someone is not going home
10 to their child because of his actions.  I am, myself, I am a
11 firm believer that there is medicine in stories and how they
12 resonate with us and how we take them into our own lives.  And
13 I know that there has been medicine in Tony's story for Tony,
14 but beyond that, I hope that there has been some today for
15 Miss Summers' family, for the postal community, and for Tony's
16 family.  Thank you.

17        THE COURT:  Do you want to address at all the Clark
18 County -- Clark County Jail incident?

19        MS. VARNER:  So the Clark County Jail incident, in my
20 estimation, Your Honor, it does look like something was
21 happening in that room.  I think it was a one-off situation.  I
22 think it is difficult to know, and without more information,
23 what Tony's role was there.  And I want to say that I have -- I
24 have visited the Clark County Jail, I am not kidding you, at
25 least 20 times and probably more than that.  And every time I

1  am at the Clark County Jail, somebody there says something to

2  me about Tony that is positive.  He, he is kind.  He is

3  respectful.  He is no problem for us.

4         I have seen someone, a staff member at the jail offer

5  Tony a bite of his sandwich.  I have seen them joke with Tony.

6  I have seen them play, like, a little prank on him, and I, I

7  think that the comments -- I also had someone tell me at the

8  jail, "Tony is respectful and kind, and I wish everyone here

9  was like that."

10         I think we have to be careful not to give that

11  incident too much weight.  Dr. Brams, our trauma expert,

12  posited that Tony is not going to be violent moving forward,

13  that his specific incident was a, a result of the constellation

14  of factors in his background.  And I think that the comments of

15  the people at the jail show that.  Those comments comport

16  exactly with Tony's community's comments about the kind of

17  person that he is.

18         Thank you.

19         THE COURT:  Thank you.

20         Mr. McGrath.

21         MR. McGRATH:  Thank you, Judge.

22         THE COURT:  Mr. McGrath, just before you get started,

23  I wanted to confirm my understanding is that there is no

24  restitution being sought?

25         MR. McGRATH:  That's correct, Judge.

1      THE COURT:  Thank you.

2      MR. McGRATH:  Yes.  Before I begin speaking, I would

3  like to acknowledge a few people that are in the room that have

4  been waiting a long time for this day:  KD, Angela's daughter

5  is present; Melanie, former spouse, also mother of KD --

6      THE COURT:  Right.

7      MR. McGRATH:  -- whose letter I spoke of earlier.  We

8  also have Mr. Crowe, who is Angela Summers' uncle here to show

9  support.

10      THE COURT:  Okay.  Where is Mr. Crowe?  Okay.  Thank

11  you.

12      MR. McGRATH:  Several management members of the United

13  States Postal Service:  Post master of Indianapolis, the

14  district manager for the State of Indiana, and the customer

15  service operator manager.  They are also present in support of

16  the family and interested in the outcome of the case.

17      There are several postal inspectors here, including

18  Case Agent De St Jean that have come to show their support; and

19  from IMPD, Homicide Detective Dustin Keedy, who investigated

20  this case alongside the postal inspectors.

21      At the outset I would like to thank the Court for

22  reviewing all of the information that was thrust upon it sort

23  of at the last minute.

24      THE COURT:  That is my job.

25      MR. McGRATH:  Thanks to counsel for putting together

1   the time and effort to -- it took to resolve a case like this,
2   and to present the best that they could for their client today,
3   and in the writings that they did.  This -- ultimately, there
4   is no real word to give the most scope as to this case other
5   than tragedy.  This is the ultimate tragedy, tragedy of
6   circumstances, tragedy of the situation, tragedy of issues in
7   the future, going forward, that may never be repaired.

8           But this crime, I think, can best be described -- and
9   my argument, I think, can best flow from the 3553(a) factors.
10  I appreciate you reading the United States' memo, Judge, that
11  pouring out of the emotive aspects of a case such as this and
12  weaving in the things about the effects that it has had on the
13  survivors.  But I think that factors themselves give us great
14  guidance on how we can evaluate what the best sentence is in
15  this case.

16          In looking at the first factor, nature and
17  circumstances of the offense and history and characteristics of
18  the offender.  Now, as I stand before you, oftentimes, I kind
19  of jumble all of that into one because it is there in the first
20  section.  It is not really separated by much other than commas,
21  but for this case, I think parsing it all out is extremely
22  important.  And I would like to do that at this time.

23          Looking at the nature of the offense, and as I stated
24  in my memo and here today, as I think everyone would reasonably
25  agree, murder is the ultimate offense.  And it is defined as

1   the unlawful killing of a person with malice aforethought, and

2   a person acts with malice aforethought if the person takes

3   someone else's life deliberately and intentionally or willfully

4   acts with callous disregard for human life, knowing that a

5   serious risk of death or serious bodily harm would result.

6         Now, looking at the submissions by the Defense

7   yesterday and reviewing those cases, cases of which had varying

8   guidelines, unclear offense levels but varying sentences above,

9   below.  All those cases; a lot of them, anyway, seemed

10   extremely harsh.  And while I can concede that Mr. Cushingberry

11   was not committing another crime as he committed this offense,

12   that doesn't take away the heinousness of it, and that should

13   not be specifically recognized as a reason --

14         THE COURT:  Can you hold on for one second?

15         MR. McGRATH:  Oh, yes, Judge.

16         THE COURT:  My computer keeps shutting off, and it is

17   driving me crazy.  We have already had him up here once.  I

18   apologize.  Go ahead.  Fingers crossed.

19         MR. McGRATH:  As I stated, it is the ultimate crime,

20   and accordingly, the most severely punished, and I think there

21   are two reasons for that.  One, you have a life.  I heard Ms.

22   Varner say there is hope in stories.  This is a story that has

23   been terminated.  A story is over.  Only the stories of the

24   past live on, and those only live on as long as memory allows.

25   So those stories have ended, and there is no next chapter.

1   So that theft is extremely considered by others when
2   thinking about how this crime affects our society, but we also
3   look to the lives of others, others such as Miss Davis, KD, who
4   so eloquently -- more eloquently than I could ever do -- put
5   forth in their letters the effect that this loss has had on
6   their life, the time stolen, the health affected, the hearts
7   shattered, the dreams thwarted, things of that nature that,
8   that, that can just never be gotten back, and only time and a
9   significant amount of healing could possibly make any better.
10  So these types of damages occurred, and this is what Tony
11  Cushingberry had wrought with the nature of this offense.

12  And circumstances of the offense, we would not be
13  remiss -- be remiss not to discuss this separately.  This
14  occurred in unprecedented circumstances, right when our
15  pandemic was really taking a grip on the country, and essential
16  services, such as the ones Miss Summers had to perform, they
17  had to go on.  They had to be done, and Miss Summers was
18  willing to take the risk to do that, and this was a situation
19  where having now a better understanding of Mr. Cushingberry,
20  knowledge of the situation there, are circumstances that I
21  think maybe in a different time and a different place may not
22  have happened, but they did happen.

23  And they didn't happen for any traditional motive that
24  we might be inclined to look at.  There was no profit.  There
25  was no revenge, not even self-preservation.  It was simply

1    nothing.  It was for nothing, a life vanquished for something
2    so immeasurably trivial as mail delivery.

3        The witnesses detailed that Mr. Cushingberry pursued
4    Miss Summers aggressively over the mail delivery, that he was
5    armed, and when mildly provoked with the dog repellent that I
6    provided the physical facts for to the Court, he made the
7    ultimate decision to end the life of another.  And I think, and
8    this is where I do appreciate what was said here today and also
9    what was put forth in the Defense memo regarding what
10   Miss Summers had posted on her Facebook account, how she had --
11   in case the Court had any questions about her decision to use
12   that dog repellent in that situation, I think now those
13   questions have been answered.

14       It was an acknowledgment that there was intense stress
15   working in that block, specifically to that house under which
16   Miss Summers had been placed.  It wasn't highlighted previously
17   by me because Mr. Cushingberry was not there, and I knew that.
18   I knew he was not present for when Miss Summers was accosted,
19   but it gives you a glimpse into the mindset of how Miss Summers
20   would approach that house.

21       It is highly demonstrative of the abuse and anxiety
22   created in Angela mere days before her death.  It is also
23   indicative of her dedication and willingness to perform a job
24   exposing her to significant risk, not only from COVID, but from
25   the public that she served.  And when she was approached by Mr.

1    Cushingberry on that day, she was right to be vigilant because

2    of the abuse that she had faced, and the actions that she chose

3    were in defense of herself.  And Mr. Cushingberry, in his

4    hypervigilance, responded with the ultimate decision to end her

5    life.

6         I think moving on, looking at the history of the

7    Defendant, there is not much else that I can provide to the

8    Court that hasn't been provided in the presentence report and

9    the sentencing materials.  They have done a fantastic job of

10   highlighting who the people closest to Mr. Cushingberry find

11   him to be, what he had overcome, what he was doing with his

12   life, and the effect that his mother had on his thought

13   process.

14        But in my opinion, after contemplating that and

15   thinking it over for the weekend -- over the past three years,

16   really, this sort of thing feeds into characteristics that I

17   think are important for the Court to understand that are

18   especially dangerous.  I have heard him described as a

19   peacemaker several times today.  I read he is a peacemaker who

20   has never known peace, but if we look at this day, his actions

21   were hardly peaceful.  They were provocative, aggressive, and

22   with malice.

23        He had been described psychologically playing the role

24   of protector for his mother who had been slighted, but he is

25   constantly in this fight-or-flight mode.  Well, in this case he

1    chose fight over flight, and not just fight, he chose to

2    destroy.

3         He was working, as I stated, the role of protector, as

4    I have heard described, for his mother who had been slighted.

5    But these were not the actions of a protector.  These were the

6    actions of an avenger, and perhaps years of futility in

7    watching his mother face abusers whom he could not deter built

8    in him this aggression and willingness to answer the slightest

9    of perceived wrongs.  And particularly in this case, to a

10   weaker target, Miss Summers was not 6 foot 2, 240.  She was

11   five, six, 150 pounds, carrying a mail bag and dog repellent.

12        The Defense has made it clear, that this is

13   essentially an ingrained trait.  So what happens next when the

14   object of his need to protect shifts to someone or someone else

15   and this feeds into the protection of the public?  But I will

16   discuss that in a moment.

17        The need for the sentence imposed to reflect

18   seriousness of the offense, promote respect for the law, and to

19   provide just punishment for the offense.  I know Your Honor and

20   everyone in this room knows the seriousness of the offense.  It

21   doesn't even bear repeating at this point.  It is the most

22   serious of offenses.

23        It is at the highest level, and a punishment

24   commensurate with that offense, as recommended by the

25   Government, strikes the appropriate chord as to what is, in

1  fact, a just punishment.

2      Affording adequate deterrence, perhaps not for Mr.
3  Cushingberry, as I stated in my memo candidly, the deterrence
4  going forward, I think, with a sentence recommended by the
5  Government, it would not have the same effect given the age he
6  would be once released and what I consider to be his sincere
7  remorse today about the events that occurred and his
8  contemplation of those events over the past three years.
9  However, it does afford adequate deterrence to the public.  It
10  shows the public how the Court values human life and how it
11  values its public servants.

12      If we are talking about protecting the public from
13  further crimes of the Defendant, I mean, I already talked about
14  the characteristics and what it took for him inside to do this
15  act, and Your Honor touched on this moments ago with Defense
16  counsel as far as the pending case and the viewing of that
17  video.  I don't know what happened in that room.

18      I could tell, essentially, that Mr. Cushingberry
19  followed three other men that went inside, reemerged at some
20  point, got a trashcan, went inside back into the room, came
21  back out with a full trashcan, and then went back inside.  And
22  then, you could see the victim inmate walking out with a towel.
23  I mean, you can't really see what is going on because the door
24  is closed, but that is another situation -- I appreciate it is
25  not proof beyond a reasonable doubt.  It is something at least

1  for the Court to consider the thought processes that Mr.

2  Cushingberry goes through under stress.

3       Being incarcerated is stressful.  I will not sit here

4  and say that it is not, and being in that setting is different

5  than being on the outside.  But it is still indicative of a

6  pattern of a willingness to do something that is not right in

7  the face of stress, and that is something that the public

8  simply cannot have in society at this time.

9       So a sentence commensurate with the Government's

10  recommendation would serve that particular sentencing need

11  well, and it would give him the time to continue his

12  reflection, his path to redemption, and the things and tools

13  that he needs to go forward with his life because he will have

14  a life after this.  His story is not over.  His child's story

15  is not over.  The love of his life's story is not over.  His

16  family's story is not over like Angela Summers' life is over.

17       There is hope.  There is a chance, but in the

18  meantime, there must be a sentence to justify because all of

19  the other sentencing factors that I have discussed.  In

20  sentencing disparities, I think this is the trickiest one as

21  far as factors go, and I, I will conclude on this.

22       I have looked at the statistics provided by the

23  Defense counsel, have read the submissions.  I have tried to

24  look up some Sentencing Commission's statistics as well for

25  this district, as well as the Seventh Circuit, basically.

1   There is simply not a lot of data there to go off of as far as
2   sentencing trends go, particularly in the Southern District of
3   Indiana where I don't believe there were any sentences of any
4   meaningful -- or at least not reported in the Sentencing
5   Commission in those stats.

6        So I will just -- generally speaking about this place
7   where we live and this place where Angela served and this
8   state, and if convicted of a similar crime for someone that was
9   not working as a federal employee and it wasn't on account of
10  his or her duties, Mr. Cushingberry would be facing 45 to 65
11  years in a state court and Detective Keedy can attest to that
12  as well.  He has investigated many cases that don't make it
13  here.  No cases make it here.

14       This is a crime strictly because of who Angela was,
15  her job, and what she did.  And anywhere else in the state,
16  anywhere else down the street, in the new Community Justice
17  Center, Mr. Cushingberry would be facing significant more
18  sentence of mandatory minimums; and here, Your Honor, you have
19  the broadest discretion in sentencing.  The term -- any term of
20  years or life is how the statute reads for second-degree
21  murder.  That is all or nothing.  That, that is the ultimate
22  discretion that the Court has, and I just wanted to highlight
23  for Your Honor.  And I know your time as state judge you have
24  sentenced cases like this before.  I don't know if I have ever
25  worked on something more tragic than this, especially from my

1   time there.

2          But essentially, there is a disparity in the treatment

3   of these types of cases in this state, and I think between that

4   and the Federal Government.  And I think the Government's

5   recommendation balances that.  It takes into consideration the

6   mitigation that has been offered, and it takes into

7   consideration all of the other sentencing factors:  The just

8   punishment, the seriousness of the offense, and the most, I

9   guess, I guess the most just way to end this and for everyone

10  to try and move forward and begin to heal as best they can.

11  Thank you.

12         THE COURT:  Thank you, Mr. McGrath.

13         So let me say first to Miss Davis and KD, that you

14  have the Court's extreme sympathy.  You have both made very

15  eloquent statements to the Court that I have carefully

16  considered, and I want you to be mindful of that.

17         I also want to thank the individuals who participated

18  in the video and supported Mr. Cushingberry, who gave me their

19  insights into their experience with him and probably,

20  particularly Nakayla, I think you are going to be -- you are

21  probably, but you are a terrific person and a terrific mom and

22  he was very lucky.  He is very lucky to have you in his life.

23  You have a spark that is, that is very, very impressive, and I

24  am sorry for you that you are going to have to raise your baby

25  alone.  But as Mr. Cushingberry noted, and I tell people this

1   all the time.  You can be a dad from prison.  It is not easy,
2   but you can be a dad from prison.  Many, many people don't even
3   put forth the effort, but I have faith that you will.

4        So let me go through the factors that are listed in
5   the federal sentencing statute.  To impose a sentence that is
6   sufficient, but not greater than necessary, which is what
7   ultimately the law requires.  So the first is the nature and
8   circumstances of the offense, and the Government used the word
9   "tragedy."  I will use the word "senseless tragedy" because
10  that is what this was, a senseless tragedy; senseless in a
11  whole host of ways.  First of all, the extreme overreaction,
12  the hypervigilance that has been acknowledged, the
13  confrontation that was unnecessary when there was information
14  about how this problem could have been solved in a peaceful
15  way.

16        It is not on you, Mr. Cushingberry, why it wasn't,
17  except for the ultimate thing that happened at the end, but
18  murder is the most serious crime.  And the reason it is is
19  because of the holes that it leaves in people's lives, and we
20  have heard a lot about some holes that you have in your life
21  because of your upbringing.  And there is therapy, and there is
22  ways for you to get help, but there is a gaping hole that is
23  now left in this child's life here.  She has got great support
24  and another mom who loves her, but the senselessness of what
25  has happened will be difficult for her to get her head around

1   and just the overreaction in terms of the nature and

2   circumstances of the offense.

3         I reread the complaint this morning and the affidavit,

4   and you told the officers you were 6 feet from her.  That would

5   be about, about me and my courtroom deputy here when you shot

6   her.  It is right there.  She was just right there in front of

7   you, and that makes it really frightening to me.

8         Your history and characteristics are utterly -- talk

9   about tragedy, utterly tragic.  It is not lost on me that your

10   mother has now left the courtroom.  You did an amazing job

11   living through all of that trauma and all of that violence and

12   all of that responsibility, an amazing job, and you exhibited

13   it in school and the way your teachers and your coaches and

14   your classmates saw how you overcame everything.  But there, as

15   your lawyer described it, there is a toxicity with your

16   relationship with your mom.  And it causes you to behave in

17   ways you don't otherwise, and I think the Government made a

18   good point in drawing the line between protector and avenger.

19         And that was a very wrongheaded decision that you made

20   on that day, but the mitigation evidence is significant.  You

21   aren't the most damaged, hurt, wounded child I have seen, but

22   you are close.  You are close.  There is no doubt about it, and

23   so you do -- the Court finds in mitigation complex trauma,

24   PTSD.

25         Your youth is not necessarily considered except for

1    the fact that I know that you do not have a fully developed
2    brain.  It has been developing over the past three years, and
3    you have a couple more years, probably a couple more than that
4    above the average because of everything that you went through
5    as a child.  You have shown an incredible capacity to love in
6    your life, which is pretty remarkable, but I can't help but
7    think about your history and characteristics.

8        The statements -- I think the Dalai Lama made the
9    statement about ripples.  You know, you did something that has
10   made a ripple, and it has caused a ripple of pain and loss and
11   heartache and not just in your family, who are here and
12   devastated, I am sure, but for this family that has lost their
13   person.  And your family can still have contact with you.  They
14   cannot, and that ripple is really significant because it is not
15   fair for trauma to be given away from you to KD.

16       Now, she is traumatized.  Now, she is experiencing
17   PTSD from losing her mom, and it is very, as you know, it is
18   very consequential.  It isn't as repetitive as what you had to
19   go through.  It isn't as violent as what you had to go through
20   in your life, but it is very real.  And I just talked about
21   that in the context of your history and characteristics, and I
22   really should talk about it as I did in the nature and
23   circumstances of the crime where the law allows me to consider
24   the impact on the victims.  And I note that both of them were
25   gracious in not asking for what people often do in terms of

retribution.  They were gracious, and many of the people who
wrote letters for you asked me to give grace, give grace to
you.  So it is something I am thinking about.

But I have to consider about a just punishment.  That
is ultimately what everybody in the law hopes for is a just
punishment, and I have to think about, then, two things:  The
harshness of the crime and your reaction in these
circumstances, the impact it had on the victims.  And those two
things in terms of a just punishment weigh heavily on me.

So I need to make sure that you are punished.  That is
going to happen one way or the other.  There was only slight
provocation in this case, though.  Yes, she sprayed the mace.
I don't know why you brought the gun over there, maybe you
always carried it, it was lawful for you to have it.  That is
not the point, but it was just such a huge overreaction.

So I am looking at some of the things that the statute
also requires.  So the seriousness of the offense I have talked
about.  Respect for the law, I very much appreciated at the end
of your statement you are apologizing for your flight because
you did flee after this happened, and you said, "I should have
stuck around" and you should have stuck around.  But once
confronted by law enforcement and after your lawyer arrived,
you did confess, and so that is a pretty quick showing of
respect for the law.

Deterrence is a tricky aspect in your case.  Specific

1    deterrence means what can I do to make sure you don't hurt
2    anybody else; and then, there is general deterrence.  And that
3    is where my consideration of what -- everybody from the postal
4    community said to me.  All these people are trying to do is
5    bring mail, and when they get confronted by people who refuse
6    to put up dogs or who give them attitudes or give them a hard
7    time, they are not allowed to carry a firearm.

8         They get the -- they get the mace, if I read the
9    letters correctly.  That is all they get is the dog repellent
10   because I am sure their employers don't want them being
11   involved in situations with guns, but especially during April
12   of 2020 when none of us knew if we were going to live or die.
13   And they had to go to work every day, and for them to be
14   confronted and the fear that they had, that is why this case
15   got national attention is because these folks had no choice.

16        They had to leave their job or go to work, one or the
17   other; and now, the place where Miss Summers worked is a place
18   where nobody wants to work because it is considered too
19   dangerous.  So deterrence, general deterrence does apply in
20   your case.  I am usually not a big fan of general deterrence,
21   but I do need to make sure that the sentence in your case says
22   to other people, in essence, don't mess with the mailman or the
23   mailwoman.  Just let them do their job and be on their way.

24        To protect the public from further crimes of the
25   Defendant, here is the other complicated part about your case.

1  Everything your lawyer says is true about the trauma and the
2  violence that you experienced and its impact on yourself and
3  your brain and your hypervigilance, but how do I know when --
4  if something like this isn't going to happen?  And I need to
5  make sure that you have time to grow up some and put all of
6  this in the very distant past because that is of concern to me.

7          I will talk about Clark County because I saw it.  I
8  don't see any evidence on that that you struck that other
9  person, but I am pretty sure it was you, as the Government
10 said, who got the trashcan, then, came out and got a bag for
11 the trashcan and then, filled the bag in the trashcan and who
12 looks like, to me, was standing up the door holding up the
13 towel so we couldn't see what was going on in there.  Whether
14 you beat that other guy or not, that is not a reactive
15 situation to me.  That is a more thoughtful situation because
16 there were 15, 16 other guys just kind of milling about.

17         One guy opened the door, whoa, closed the door, backed
18 off of the situation, wouldn't go in there.  So that concerns
19 me, and I recognize what your lawyer says and recognize the
20 good progress that you have shown with the classes that you
21 have submitted.  And they have kept you there so they haven't
22 asked the marshal to move you so that is probably a sign they
23 think that you are respectful and okay, but I really wish that
24 hadn't happened because it makes me wonder about your thought
25 process.

1     There are programs that we can help you in.  I am glad
2 you suggested the BRAVE program.  I think it would be an
3 appropriate program for him, given his age.  There will be
4 others, but there is all kinds of training and educational
5 programming that you can participate in with your diploma,
6 especially you should be able to get into higher education
7 classes while you are there.

8     I want to talk about disparity.  I am not satisfied of
9 the, the specificity of the, of the guidelines information
10 because I don't know where the people started to know where
11 they ended up on the guideline range, and so.  And then, on the
12 flip side of that, I looked up the Government's request for me
13 to consider disparity vis-a-vis state sentences.  The Circuit
14 is very clear that that is an inappropriate use of that
15 sentencing factor.

16     It is to avoid -- the goal of 18 U.S.C. 3553(a)(6) is
17 to avoid unwarranted sentencing disparities among italicized
18 federal defendants, and that is *United States v. Schmitt*, 495
19 F.3d 860 -- well, it is *United States v. Williams*, citing
20 *United States v. Schmitt*.  And the *United States v. Williams*
21 case is a 2022 case.

22     So I am not going to aggravate the sentence or vary
23 upward because of the sentencing disparity.  The choice to file
24 here was the choice to file here so this is the scheme that we
25 are going to have, but I am also not inclined to vary below the

1   guidelines because I believe that with respect to the nature

2   and circumstances of the offense, the impact on the victims,

3   and the senselessness of this crime, the guidelines account

4   for -- the guidelines don't necessarily account for everything.

5   But the way, what I consider there to be some aggravating

6   factors in this case, which was the absolute senselessness of

7   what happened and the risk that Miss Summers was under because

8   of COVID, that is somewhat aggravating.

9        And I think the impact on the victim, which the

10   Circuit also says can be relied upon to vary upward, is

11   aggravating.  But I am not going to use it to vary upward.  I

12   am going to use all that to say I think it balances out, and a

13   guideline sentence is appropriate.

14        Angela Summers was 45 years old on the day that she

15   died, almost 46, and her life expectancy for the State of

16   Indiana -- I did, taking judicial notice of the federal life

17   expectancy tables -- is 75.  And the Court concludes that a

18   sentence of 360 months, which is within the guidelines, is an

19   appropriate sentence in this case.  That is 30 years, Mr.

20   Cushingberry, which I believe is an appropriate measure of the

21   loss and harm inflicted in this case.  So I will go ahead and

22   state the proposed sentence at this time.

23        Pursuant to the Sentencing Reform Act of 1984, it is

24   the judgment of the Court that the Defendant, Tony

25   Cushingberry, also known as Tony Cushingberry-Mays, is hereby

1  committed to the custody of the Bureau of Prisons to be

2  imprisoned for a term of 360 months for the reasons just

3  stated.

4       The Court will recommend participation in the BRAVE

5  program, mental health treatment, including treatment for

6  trauma, substance abuse treatment, including RDAP, cognitive

7  behavioral training, vocational training, including CDL, higher

8  education classes.  The Court will also recommend, although I

9  am not sure what the nature of the crime this will be honored,

10 but I will recommend placement in a medium security facility.

11      The Court notes the Defendant -- there is no request

12 for restitution in the case.

13      The Court will also order that a fine of $1,000 be

14 paid.  The Court is ordering that fine in order to account for

15 additional punishment within the guidelines and also to assist

16 Mr. Cushingberry in getting a job.  The Defendant shall --

17 while in prison.

18      The Defendant shall forfeit a Glock, Model 19 Gen 5,

19 9-millimeter Luger caliber semiautomatic pistol bearing Serial

20 No. BGUK332 and any ammunition.

21      Supervised release is not required by statute, but the

22 Court is imposing a three-year term of supervised release

23 following Mr. Cushingberry's release from prison setting forth

24 or incorporating, by reference, those conditions set forth in

25 Paragraph 63 and 64 of the presentence investigation report.

1    The Court is also ordering the Defendant to pay the
2    mandatory special assessment of $100.  Payment of the fine and
3    restitution are due immediately and are to be made directly to
4    the clerk of the United States District Court.
5    Counsel, do you have any legal objection to the
6    sentence that I have proposed, or do you require any further
7    elaboration of my reasons under Section 3553(a), Mr. McGrath?
8    MR. McGRATH:  No, Your Honor.
9    THE COURT:  Ms. Varner?
10    MS. VARNER:  No, Your Honor.
11    THE COURT:  Is there any recommendation as to a
12    placement location?
13    MS. VARNER:  Your Honor, if Your Honor is recommending
14    that he may go to a medium facility, FCI Greenville.
15    THE COURT:  Okay.  The Court will recommend FCI
16    Greenville, and with that addition -- do they have BRAVE there?
17    MS. VARNER:  They do.
18    THE COURT:  Okay, great.
19    All right.  The Court will order the sentence imposed
20    as stated.
21    Mr. Cushingberry, you can appeal your conviction if
22    you believe that your guilty plea was somehow unlawful or
23    involuntary or if there is some other fundamental problem in
24    the proceedings that was not waived by your guilty plea; do you
25    understand?

1    THE DEFENDANT:  Yes, ma'am.

2    THE COURT:  All right.

3         Normally you would have the right to appeal your

4    sentence.  However, you can give up that right as part of a

5    plea agreement, and you have entered into a plea agreement

6    which contains a waiver of your right to appeal.  Do you

7    remember us talking about that?

8    THE DEFENDANT:  Yes, ma'am.

9    THE COURT:  Okay.  That waiver is generally

10   enforceable, but if you believe it is not valid, you can

11   present that theory to the Court of Appeals; do you understand?

12   THE DEFENDANT:  Yes, ma'am.

13   THE COURT:  To begin an appeal you must file a notice

14   of appeal within 14 days of the entry of judgment.  Upon

15   request, the clerk of court can prepare and file a notice of

16   appeal.  If you cannot afford the filing fee or cannot afford

17   to pay a lawyer to appeal for you, the Court will appoint a

18   lawyer to represent you on appeal.  Do you have any questions

19   about your appellate rights, your appellate waiver, or the time

20   limit for filing a notice of appeal?

21   THE DEFENDANT:  No, ma'am.

22   THE COURT:  All right.

23   Mr. McGrath, the remaining count?

24   MR. McGRATH:  Yes, Judge.  We move to dismiss Count

25   II.

1    THE COURT:  Count II.  Any objection, Ms. Varner?

2    MS. VARNER:  No, Your Honor.

3    THE COURT:  Count II is dismissed.

4    Is there anything further for the Government?

5    MR. McGRATH:  No, Your Honor.

6    THE COURT:  For the Defense?

7    MS. VARNER:  No, Your Honor.

8    THE COURT:  The Court orders the Defendant remanded to

9    the custody of the United States Marshal.  Good luck to you,

10    Mr. Cushingberry.

11    THE CLERK:  All rise.

12    (Concluded, 2:32 p.m.)

13    - - -

14    CERTIFICATE OF COURT REPORTER

15

16    I, Jean A. Knepley, hereby certify that the

17    foregoing is a true and correct transcript from reported

18    proceedings in the above-entitled matter.

19

20

21    /S/ Jean A. Knepley                    July 9, 2023
     JEAN A. KNEPLEY, RDR/CRR/CRC/FCRR    Date
22    Official Court Reporter
     Southern District of Indiana
23    Indianapolis Division

24

25